**John ROE, Plaintiff–Appellant,**

v.

**CITY OF SAN DIEGO; San Diego City Police Department; David Bejarano; George Saldamando; Glenn Breitenstein, Defendants–Appellees.**

No. 02–55164.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 2003.

Filed Jan. 29, 2004.

Michael P. Baranic, Gattey Cooney & Baranic LLP, San Diego, CA, for the Plaintiff–Appellant.

Penny L. Castleman, Deputy City Attorney, San Diego, A, for the Defendants–Appellees.

Before: D.W. NELSON, WARDLAW and FISHER, Circuit Judges.

Opinion by Judge FISHER; Dissent by Judge WARDLAW.

FISHER, Circuit Judge.

Plaintiff–Appellant John Roe,[1] while a San Diego police officer, videotaped him-

---

1. Roe is proceeding under a pseudonym pursuant to a district court order granting him permission to do so.

self stripping off a generic police officer's uniform and engaging in acts of masturbation. He offered these home-made videos for sale on the adults-only section of the popular online auction site eBay, using a fictitious name and a Northern California address. Although the videos did not reveal his connection with the San Diego Police Department (the "Department"), Roe was unmasked when one of his supervisors discovered the videos online and recognized Roe's picture. The Department confronted Roe, who readily admitted making and selling the videos, and eventually fired him. Roe sued the Department, the City of San Diego and his supervisors in federal district court under 42 U.S.C. § 1983, alleging that his off-duty, non-work-related activities were protected by the First Amendment and could not be grounds for terminating his employment. The district court dismissed Roe's claim, concluding that the videos did not address a matter of "public concern," and thus the Department did not violate Roe's constitutional rights by firing him. We conclude that the district court erred, and reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Roe was employed as a City of San Diego police officer for more than seven years. He was fired after the San Diego Police Department discovered that he was selling sexually explicit, non-obscene videos on the adults-only section of eBay. The videos depict Roe alone, with his face partially masked, taking off a generic police uniform and masturbating.

The Department became aware of Roe's activities on eBay through the following sequence of events. In July 2000, Roe's supervisor, Sergeant Robert Dare, searched eBay and located a tan uniform formerly used by the San Diego Police Department. The uniform was offered for sale by a person with the eBay username "Code3stud@aol.com."

Sgt. Dare searched eBay for other items offered for sale by Code3stud and discovered there were such items in eBay's adults-only section. After complying with eBay's access requirements, Sgt. Dare entered the adults-only section and viewed the listings for the items offered by Code3stud. Some of the listings contained Code3stud's picture, and Sgt. Dare recognized the man pictured as Roe.

Sgt. Dare printed out some of the listings and shared them with other supervisors in Roe's chain of command, including Captain Glenn Breitenstein. Capt. Breitenstein contacted the Department's Professional Standards Unit ("PSU"), which began an investigation into Roe's activity on eBay. On July 21, 2000, an undercover PSU investigator, Sergeant Alan Clark, purchased two items from Code3stud: a pair of white men's briefs and a videotape depicting Roe engaging in masturbation. On September 7, Sgt. Clark, again acting undercover, asked Code3stud to produce a custom-made videotape depicting Code3stud issuing another man a citation and then masturbating. Code3stud agreed, produced the video and sold it to Sgt. Clark.

All aspects of the production and sale of the videotapes were conducted while Roe was off-duty and away from his employer's premises and did not involve the use of any City or Department resources. None of the items Roe offered for sale identified

2. Because this case comes before the court on appeal from a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), all facts alleged in Roe's complaint must be taken as true and must be construed in the light most favorable to him. *Transmission Agency v. Sierra Pac. Power Co.,* 295 F.3d 918, 923 (9th Cir.2002).

Roe as an employee of the City or Department or as being affiliated with them in any way. He never identified himself by name in any sale or listing, and he never identified himself as a San Diego Police officer. He described himself in his eBay seller's profile as living in "Northern California" and being "in the field of law enforcement." He directed all payments to "S. Shatswell," a fictitious name, and utilized a post office box address in Northern California. There is no evidence that Code3stud's real identity was ever discovered by anyone other than Sgt. Dare and the other police officers involved in the investigation.

On October 17, 2000, Sgt. Clark interviewed Roe in person about his sale of videos and clothing on eBay. Roe readily admitted to the off-duty conduct. Sgt. Clark completed his investigation on November 30 and concluded that Roe had violated three Department policies: Policy 9.06—Unbecoming Conduct, Policy 9.07—Immoral Conduct, and Policy 5.12—Outside Employment. On December 20, 2000, Capt. Breitenstein ordered Roe "to cease displaying, manufacturing, distributing or selling any sexually explicit materials or engaging in any similar behaviors, via the internet, U.S. Mail, commercial vendors or distributors, or any other medium available to the public."

Roe removed all items he had listed for sale on eBay but did not change his seller's profile, which described the first two videos he had produced and listed their prices, as well as the price for a custom-made video. On February 13, 2001, Sgt. Dare submitted a report concluding that Roe had violated a fourth Department Policy 9 .04—Obedience to Lawful Orders—

and recommended disciplinary action. After providing Roe with notice and a hearing, the Department terminated Roe's employment on June 29, 2001 for violation of all four Department policies. There is no evidence in the record that Roe's job performance was unsatisfactory; his final performance evaluation, covering January 7 to April 27, 2001, indicates that he met expectations and received one letter of commendation.

On September 28, 2001, Roe brought suit under 42 U.S.C. § 1983, alleging that he was terminated principally for the content of his videos in violation of his constitutional right to freedom of speech.[3] Roe sued the City and the Department, as well as Chief of Police David Bejarano, Assistant Chief of Police George Saldamando and Capt. Breitenstein in their official and individual capacities. Roe seeks back pay with interest, compensatory and punitive damages, reinstatement and an injunction prohibiting the City and Department from taking further punitive actions against him.

On November 16, 2001, the defendants moved to dismiss Roe's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted the motion on December 20, 2001 because it determined that Roe's speech did not touch on a matter of "public concern." Roe filed a timely notice of appeal on January 18, 2002, challenging the dismissal of his First Amendment claim.

## II. STANDARD OF REVIEW

Dismissals for failure to state a claim under Rule 12(b)(6) are reviewed de novo.

---

**3.** Roe also alleged that his termination violated his constitutional right to due process and his rights under state law. The district court dismissed the due process claim with prejudice after Roe conceded that his claim was

without merit. The court dismissed the state law claims "without prejudice if Plaintiff chooses to refile in state court." On appeal, Roe does not challenge the dismissal of his due process and state law claims.

*Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir.2001). We must accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to the plaintiff. *Id.* "Dismissal for failure to state a claim is appropriate if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotation marks omitted). Whether a government employee's speech is a matter of public concern is a question of law that we review de novo. *Nunez v. Davis*, 169 F.3d 1222, 1226 n. 1 (9th Cir.1999).

## III. DISCUSSION

In order to state a prima facie claim against a government employer for violation of the Free Speech Clause of the First Amendment, "an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003); *see also Ulrich v. City & County of San Francisco*, 308 F.3d 968, 976 (9th Cir.2002). A public employee's speech is protected only if the employee speaks "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Once the employee has made a prima facie claim, the burden shifts to the public employer to demonstrate either that, under the balancing test established

by *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the employer would have reached the same decision even in the absence of the employee's protected conduct. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675–76, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Ulrich*, 308 F.3d at 976–77.

Only the first element of the employee's prima facie case—the public concern test—is at issue here. The district court dismissed Roe's case because it ruled that his speech did not touch on a matter of "public concern." Although there is a well-developed constitutional jurisprudence that addresses the meaning of "public concern," that jurisprudence has typically focused on employee speech that takes place at work or that addresses the policies of the government employer. Here, we deal with videos that were made and sold outside the workplace and said nothing about the employer or any government agency. We therefore must decide whether such off-duty, non-work-related speech receives qualified protection under the public concern test.[4]

We are not the first court to confront this question. In *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the Supreme Court held that

---

4. The dissent contends that Roe's speech is "plainly related to his job." *Post* at 1126. However, the defendants have not argued that Roe's speech is in any way related to his employment with the San Diego Police Department or the City, nor do they argue that offering to sell a uniform formerly used by the SDPD somehow linked Roe's videos to the Department. On the contrary, they have conceded that this case involves speech unrelated to the job: "Roe correctly states that [the] Ninth Circuit has never addressed the exact issue which we have here—off duty conduct, *unrelated to work.*" Responding Br. of Appellees at 28 (emphasis added).

government employees' "expressive activities" that "were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment" fell "within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace." *Id.* at 466, 115 S.Ct. 1003. Similarly, Roe's expressive activities—as crude as they may appear—were directed at a "segment[ ] of the general public" and did not have "any relevance to [his] employment." *Id.* at 465, 115 S.Ct. 1003. As we explain in greater detail below, we therefore hold that Roe's expressive conduct falls within the protected category of citizen comment on matters of public concern, rather than employee comment on matters related to his personal status in the workplace.

Consequently, Roe's First Amendment claim must be resolved under *Pickering* balancing by weighing the free speech interests at stake against the Department's legitimate interests as an employer in promoting the efficiency of the public services it performs. *See id.* at 466, 115 S.Ct. 1003; *Umbehr,* 518 U.S. at 676, 116 S.Ct. 2342. Alternatively, the Department can prevail under *Mt. Healthy's* mixed motive analysis if it can prove by a preponderance of the evidence that it would have terminated Roe regardless of his speech. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *Umbehr,* 518 U.S. at 685, 116 S.Ct. 2342. Because the district court did not reach the *Pickering* balancing test or the *Mt. Healthy* mixed motive analysis, we remand the case to the district court for further proceedings.

### A.

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Although "as a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), some kinds of speech receive no protection at all from government intrusion. The categories of unprotected speech include child pornography, *New York v. Ferber,* 458 U.S. 747, 763–64, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); imminent incitement, *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); true threats, *Watts v. United States,* 394 U.S. 705, 707–08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam); obscenity, *Roth v. United States,* 354 U.S. 476, 483–85, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); libel, *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952); and fighting words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572–73, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

Within the broad realm of protected expression, the level of protection varies depending on the subject matter of the speech. The Supreme Court "has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick,* 461 U.S. at 145, 103 S.Ct. 1684 (quoting *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), and citing *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)); *see also First Nat'l Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (noting that speech on governmental affairs lies "at the heart of the First Amendment's protection"). This is because "[t]he protection given speech ... was fashioned to assure unfettered interchange of ideas for the bringing about of political and social

changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

■ Other kinds of speech, such as commercial speech and some kinds of entertainment, occupy subordinate positions in the hierarchy but are still entitled to some protection. *See, e.g., City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion) (nude erotic dancing); *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (commercial speech). Sexually explicit entertainment that is not obscene and that does not involve children falls within the ambit of the First Amendment. *See, e.g., Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 240, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("virtual child pornography").

If Roe were simply a member of the general public rather than a public employee, there is no doubt that his sexually explicit but not obscene videos would be entitled to some measure of First Amendment protection against government censure. The question we face here is whether Roe's status as a public employee means he has no First Amendment protection even though his expressive conduct occurred off-duty, away from the workplace and said nothing about Roe's government employment or employer. We conclude that Roe's expressive conduct retains a qualified First Amendment protection under the public concern test.

**B.**

To aid in understanding the public concern test and its application here, we first review the test's origins and evolution. For roughly the first half of the twentieth century, it was "unchallenged dogma ... that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick,* 461 U.S. at 143–44, 103 S.Ct. 1684 (citing five Supreme Court cases decided between 1882 and 1952). Justice Holmes' classic epigram, written while he served on the Supreme Judicial Court of Massachusetts, aptly expresses this view: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N.E. 517, 517 (1892). During the 1950s and early 1960s, however, that dogma began to change. In a series of cases, the Supreme Court recognized that public employees could not be required as a condition of employment to swear oaths of loyalty to the state and reveal the groups with which they associated. *See Connick,* 461 U.S. at 144, 103 S.Ct. 1684 (citing six Supreme Court cases decided between 1952 and 1963).

Building on these cases, the Supreme Court recognized in its 1968 *Pickering* decision that government retaliation against public employees for engaging in protected speech can violate the First Amendment. *Pickering,* 391 U.S. at 574–75, 88 S.Ct. 1731. The Court held unconstitutional the dismissal of a public high school teacher for sending a letter to a local newspaper criticizing the board of education for, among other things, its allocation of school funds between educational and athletic programs. *Id.* at 569, 88 S.Ct. 1731. *Pickering* established a balancing test whereby "the interests of the [employee], as a citizen, in commenting upon matters of public concern," are weighed against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731.

Fifteen years later in *Connick*, the Supreme Court elaborated on the meaning of "public concern." 461 U.S. at 146, 103 S.Ct. 1684. That case involved a free speech claim brought by an assistant district attorney who was terminated after she had distributed a questionnaire to her fellow staff members concerning "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141, 103 S.Ct. 1684. The plaintiff circulated the questionnaire after objecting strongly to the district attorney's decision to transfer her to a different part of the criminal court. *Id.* at 140, 103 S.Ct. 1684. Rather than apply the *Pickering* balancing test initially, the Supreme Court held that the balancing test is to be preceded by a threshold inquiry implicit in *Pickering* itself:

> [W]hen a public employee speaks *not as a citizen upon matters of public concern*, but instead *as an employee upon matters only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684 (emphasis added).

The Court's purpose in imposing the threshold public concern test was to avoid the constitutionalization of common workplace grievances between public employers and employees. *See id.* at 149, 103 S.Ct. 1684. The Court took the view "that government offices could not function if every employment decision became a constitutional matter." *Id.* at 143, 103 S.Ct. 1684.

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criti-

cism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 149, 103 S.Ct. 1684. The public concern test was thus intended to weed out claims in which an adverse employment action is taken against an employee for complaining about internal office affairs, such as the employee's conditions of employment or job status. *See id.*

The Supreme Court did not articulate a precise definition of "public concern" but concluded that an employee's *job-related* speech touches on a matter of public concern when it is relevant to the public's evaluation of the government employer's performance. *See id.* at 148, 103 S.Ct. 1684. Thus, an employee's attempt to "bring to light actual or potential wrongdoing or breach of public trust" on the part of the government employer constitutes a matter of public concern, *id.*, as does an employee's public criticism of the policy choices made by the government employer, such as the allocation of funds, *see Pickering*, 391 U.S. at 569–70, 88 S.Ct. 1731.

The Court in *Connick* held that only the last of the issues addressed in the plaintiff's questionnaire—whether employees were being pressured to work on political campaigns on behalf of office-supported candidates—touched on a matter of public concern. *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. The other topics—office transfer policy, office morale, the need for a grievance committee and the level of confidence in supervisors—were, in the Court's view, "mere extensions of[the plaintiff's] dispute over her transfer" that were thus

not "of public import in evaluating the performance of the District Attorney." *Id.* at 148, 103 S.Ct. 1684. The Court therefore applied *Pickering* balancing to the last issue on the questionnaire.

Since *Connick*, the typical public concern case has "invariably involved some form of criticism or questioning of the public employer's policy, or of its specific actions, or of supervisory personnel expressed either privately to the employer or publicly." *Berger v. Battaglia*, 779 F.2d 992, 997 (4th Cir.1985) (footnotes omitted). *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), for example, involved an obstetrics nurse who was allegedly fired for comments she made to a coworker criticizing the obstetrics department. *Id.* at 664–65, 114 S.Ct. 1878. *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), concerned an independent contractor whose government contract was allegedly terminated because he criticized the county and the board of commissioners. *Id.* at 671, 116 S.Ct. 2342. The protected status of such speech turns on "whether the public employee was merely complaining privately about matters personal to himself, such as whether he was being paid enough or given deserved promotions ... or whether he was whistleblowing or otherwise 'going public' with matters in which the public might be expected to take an interest." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994).

Many of this Circuit's public concern cases have also involved speech by public employees about their government employer or employment. In these cases, we have held the speech in question to be unprotected when it related only to the employee's status in the workplace. *See, e.g., Coszalter*, 320 F.3d at 974 (holding that a city employee's disclosures of health and safety hazards to the state regulatory agency and the public touched on matters of public concern); *Ulrich*, 308 F.3d at 978 (holding that a doctor's protest against the laying off of other physicians was of public concern because it "touched on the ability of the hospital to care adequately for patients, sparking debate about whether there were less harmful ways to address the hospital's budgetary problems"); *Havekost v. United States Dep't of the Navy*, 925 F.2d 316, 319 (9th Cir.1991) (holding that an "internal dispute over the Navy's dress code, scheduling, and responsibility for certain lost commissary profits" were "the minutiae of workplace grievances" and thus not of public concern).

Indeed, all our Circuit's cases on which the dissent relies in interpreting the public concern test, *post* at 1126–1127, involve speech related to the employee's job. In addition to *Ulrich* and *Havekost* mentioned above, see *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir.2001) (statement by employee of state department of prisons that the department's substance abuse program was at risk of being discontinued due to his supervisor's failure to secure funds); *Roe v. City & County of San Francisco*, 109 F.3d 578, 580–81 (9th Cir. 1997) (discussed below); *McKinley v. City of Eloy*, 705 F.2d 1110, 1112 (9th Cir.1983) (criticism by police officer of the city council's decision not to give police officers an annual raise). These cases acknowledge that speech is not of public concern when it relates only to personnel disputes or grievances. A good example is *Roe v. City & County of San Francisco*, 109 F.3d 578, from which the dissent quotes extensively. *See post* at 1126–1127, 1127–1128, 1128–1129. That particular Roe, a police officer as well, wrote a memo to a prosecutor who had refused to prosecute one of Roe's drug cases, attaching some legal authorities that he thought would be helpful. *Roe*, 109 F.3d at 581. When Roe was subsequently transferred to another department, he claimed the transfer was retaliatory in vio-

lation of his right to free speech. *Id.* at 582. In assessing whether Roe's memo addressed a matter of public concern, we said, "The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a *private grievance.*" *Id.* at 585 (emphasis added). As we held, "[a]n *internal dispute* with no wider societal implications is not a matter of public concern. Instead, it falls within the genre of 'personnel disputes and grievances' which are not constitutionally significant." *Id.* at 586 (quoting *McKinley,* 705 F.2d at 1114) (emphasis added). On the other hand, we recognized that "[t]o deserve First Amendment protection, it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested." *Id.* at 585.

The Supreme Court extended the public concern test in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), to public employee speech that did not relate to the employee's job or the government employer but that did occur *at work.* In that case, a clerical employee in a county constable's office was fired for commenting to a coworker, upon hearing of the assassination attempt on President Reagan, that "if they go for him again, I hope they get him." *Id.* at 381, 107 S.Ct. 2891. The Court held that the statement dealt with a matter of public concern because it was "made in the course of a conversation addressing the policies of the President's administration" and "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President." *Id.* at 386, 107 S.Ct. 2891. As a result, the Court for the first time "applied the *Pickering* balance to speech whose content had nothing to do with the workplace." *NTEU,* 513 U.S. at 466 n. 10, 115 S.Ct. 1003. In this Circuit, we subsequently examined public employee speech

that is not about the job but occurs at work in *Tucker v. California Department of Education,* 97 F.3d 1204 (9th Cir.1996). That case dealt with religious advocacy in the workplace. In holding such advocacy to be "obviously of public concern," we recognized that "[t]his circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace." *Id.* at 1210 (emphasis in original). Neither *Rankin* nor *Tucker* directly governs the facts of Roe's case, however, because Roe's non-job-related speech occurred away from the workplace.

Thus we turn to the Supreme Court's decision in *NTEU,* which applied the public concern and *Pickering* balancing tests to public employee speech that took place "outside the workplace, and involved content largely unrelated to[the employees'] government employment." *NTEU,* 513 U.S. at 466, 115 S.Ct. 1003. *NTEU* involved a First Amendment challenge to a statute that prohibited federal executive branch employees from receiving honoraria for individual appearances, speeches or articles. *Id.* at 459–60, 115 S.Ct. 1003. The suit was brought by a class comprising all executive branch employees below grade GS–16 who, but for the challenged statute, would receive honoraria. Although the class action did not address the government's suppression of any single instance of speech, the named plaintiffs submitted affidavits describing the types of expressive conduct for which they had received honoraria prior to the ban. These included articles about the environment and Russian history, lectures on the Quaker religion and black history, and radio and television reviews of dance performances. *Id.* at 461–62, 115 S.Ct. 1003. Whether these expressive activities touched on matters of public concern was not the central issue in the case, but the District of Columbia Circuit had "pause[d]

briefly" to consider the issue and readily concluded that the plaintiffs' lectures and articles constituted speech on matters of public concern:

> [W]e read the "public concern" criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche. None of the examples of past or intended expression mentioned by plaintiffs involves such a parochial concern.

*Nat'l Treasury Employees Union v. United States,* 990 F.2d 1271, 1273 (D.C.Cir. 1993).[5] The Supreme Court did not disagree with the D.C. Circuit's reasoning. Indeed, the Court emphasized that the plaintiffs "seek compensation for their expressive activities in their capacity as citizens, not as Government employees." *NTEU,* 513 U.S. at 465, 115 S.Ct. 1003. It noted that "[w]ith few exceptions, the content of [plaintiffs'] messages has nothing to do with their jobs." *Id.* "[The plaintiffs] do not address audiences composed of coworkers or supervisors; instead, they write or speak for segments of the general public. Neither ... the subject matter of their expression ... nor the kind of audiences they address has any relevance to their employment." *Id.*

The Court emphasized that it had "applied *Pickering*'s balancing test only when the employee spoke '*as a citizen* upon matters of public concern' rather than '*as an employee* upon matters only of personal interest.'" *Id.* at 466, 115 S.Ct. 1003 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684) (emphasis added by *NTEU* ). "Thus," the Court continued, "private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer. If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action." *Id.* (citation omitted). The Court concluded that the plaintiffs' "expressive activities ... fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace," because "[t]he speeches and articles for which [the plaintiffs] received compensation in the past were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment." *Id.* As in *Rankin,* the Court then applied *Pickering* balancing, concluding that the employees' interest in expressing themselves outweighed the government's interest in operational efficiency. *Id.* at 466–77, 115 S.Ct. 1003.[6]

---

5. The dissent contends that the public concern test was not an issue in the case at all. *See post* at 1129. However, the Court had to decide whether the speech at issue addressed a matter of public concern before it could reach the *Pickering* balancing phase. *See Connick,* 461 U.S. at 146, 103 S.Ct. 1684 ("[I]f [the employee's speech] cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [the court] to scrutinize the reasons for [the employee's] discharge.").

6. The dissent suggests we should turn to *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct.

1878, 128 L.Ed.2d 686 (1994) (plurality opinion), instead of *NTEU* for guidance. *Post* at 1130. We agree with the lesson the dissent urges us to take away from *Connick* and *Waters,* that "the government's power as employer is broader than its power as sovereign." *Post* at 1131. The question remains, however, just *how* broad that power is in the specific context of off-duty, non-job-related speech. *Waters* does not address that question, but Justice O'Connor, the author of the plurality opinion in *Waters,* did so in *NTEU.* She readily concluded that the speech at issue there met the public concern threshold because "[r]espondents challenge the ban as it

Although in this Circuit we have not yet addressed the degree of protection to be afforded off-the-job, non-work-related speech by public employees, we did cite *Berger v. Battaglia*, 779 F.2d 992 (4th Cir.1985), with approval in *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir.1997). In *Berger*, the Fourth Circuit held that a police officer's off-duty, non-job-related musical performances in "blackface" makeup were matters of public concern even though the employee claimed and the court presumed that the performances were "neutral as to any political or even social views." *Berger*, 779 F.2d at 999.[7] As the court aptly observed in explaining its holding:

> *Pickering*, its antecedents, and its progeny—particularly *Connick*—make it plain that the "public concern" or "community interest" inquiry is better designed—and more concerned—to identify a narrow spectrum of employee speech that is not entitled even to quali-

fied protection than it is to set outer limits on all that is. The principle that emerges is that *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely *"personal concern"* to the employee—most typically, a private personnel grievance.

*Id.* at 998 (second emphasis added).[8]

## C.

■ These precedents confirm what the Supreme Court first explained in *Connick*: the purpose of the public concern test is to preempt a narrow category of claims involving speech related to a public employee's status in the workplace. Accordingly, we hold that when the employee's speech is not about his government employer or employment, is directed to a segment of the general public and occurs outside the

---

applies to off-hour speech bearing no nexus to Government employment—speech that by definition does not relate to 'internal office affairs' or the employee's status as an employee. *Cf.* [*Connick v. Myers*]." *NTEU*, 513 U.S. at 480, 115 S.Ct. 1003 (O'Connor, J., concurring in part and dissenting in part). Moreover, the same Court that decided *Waters* resolved *NTEU* only a year later. Thus, we believe that *Waters* does not counsel an approach different from that in *NTEU*.

7. The dissent claims that *Berger* is "inapposite" because that case involved "artistic expression" whereas Roe's speech does not. *Post* at 1127. But *Berger* viewed artistic expression broadly: "[o]ne of the fundamental rights secured by the amendment is that of free, uncensored artistic expression—even on matters trivial, vulgar, or profane." *Berger*, 779 F.2d at 1000.

8. Other circuits that have addressed off-duty, non-work-related speech have concluded that balancing is the appropriate method to resolve the public employee's First Amendment claims. *See Melzer v. Bd. of Educ. of N.Y.*,

336 F.3d 185, 194–200 (2d Cir.2003) (assuming that a high school teacher's membership in the North American Man/Boy Love Association touched on a matter of public concern and holding under *Pickering* balancing that the school was justified in terminating the teacher's employment); *Pappas v. Giuliani*, 290 F.3d 143, 146–48 (2d Cir.2002) (assuming that a police officer's off-duty, anonymous mailings of racist materials were of public concern and holding under *Pickering* balancing that the police department was justified in firing the officer); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026–28 (7th Cir.1994) (holding that even if an assistant state's attorney's novel about the criminal justice system did not touch on a matter of public concern, his employer had to show legitimate interests that outweighed the social interest in the attorney's speech); *Flanagan v. Munger*, 890 F.2d 1557, 1562–67 (10th Cir.1989) (holding that the public concern test did not apply to the sale of sexually explicit, non-obscene videos by police officers because the expressive conduct did not occur at work and was not about work, and that *Pickering* balancing tipped in the officers' favor).

workplace, that speech satisfies the public concern test because such speech is not related to the employee's status in the workplace.[9]

█ In determining whether Roe's expressive conduct meets the public concern threshold, we consider the "content, form, and context" of his speech. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. With respect to content, as we have already noted, the defendants do not argue that Roe's sexually explicit videos are in any way about the San Diego Police Department or the City of San Diego. *See supra* note 4. Indeed, the defendants concede that Roe's expressive conduct is "unrelated to work." Responding Br. of Appellees at 28. "[When] the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication ... we conclude that it is necessary to regard the [employee] as the member of the general public he seeks to be." *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731; *see also NTEU*, 513 U.S. at 466, 115 S.Ct. 1003 (concluding that public employee speech was matter of public concern because, *inter alia*, it "involved content largely unrelated to their government employment.").

The dissent and defendants argue, however, that the content of the speech must in some way enlighten the public on issues of political or social importance in order to be protected under the public concern test. *See post* at 1128–1129. Justice Scalia's dissent in *Rankin* took this narrow view of

"public concern." *See* 483 U.S. at 395, 107 S.Ct. 2891 (Scalia, J., dissenting) ("[S]peech on matters of public concern is that speech which lies at the heart of the First Amendment's protection.") (internal quotation marks and citation omitted). Neither the *Rankin* nor the *NTEU* majorities adopted this view; accordingly, neither do we. Otherwise, we would remove a broad array of public employee speech from First Amendment protection, giving the public concern test a role for which it was never intended. The purpose of the test is to prevent the constitutionalization of "employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. That purpose is not implicated here where Roe's speech is not about his employment or employer.

█ The dissent also contends that "[t]he pornographic nature of Roe's videos is highly relevant" and that Roe's videos constitute the "lowest level" of speech. *Post* at 1128, 1129. But even the expression of "ideas that the overwhelming majority of people might find distasteful or discomforting" is protected by the First Amendment. *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003) (cross burning). It is "well established that speech may not be prohibited because it concerns subjects offending our sensibilities." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245–46, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (protecting virtual child pornography that is produced

---

9. Contrary to the dissent's characterization, we have not established a "new definition of the public concern test." *See post* at 1129. Rather, we have merely applied the public concern test to off-the-job, non-work-related speech. In doing so, we interpret "public concern" in the same way as the Supreme Court and this Circuit have in other contexts: speech that "does not relate to internal office affairs or the employee's status as an employee." *NTEU*, 513 U.S. at 480, 115 S.Ct. 1003

(O'Connor, J., concurring in relevant part and dissenting in part) (internal quotation marks omitted).

The dissent also claims that Roe himself does not assert that his videos convey speech on a matter of public concern. *See post* at 1127. Although Roe urges this court to adopt the Tenth Circuit's approach in *Flanagan, see supra* note 8, he also argues that his speech meets the public concern test. *See* Br. of Appellant at 26.

without using real children). Roe's videos are indeed crude and sexually explicit, but they are not obscene under Supreme Court precedents and thus would be entitled to some protection under the First Amendment. *See id.*

The level of the First Amendment interest at stake is an important factor in the *Pickering* balancing phase, but the relevant content inquiry for purposes of the public concern test is whether the subject matter of the public employee's speech falls within the "genre of personnel disputes and grievances," a category of speech that is not constitutionally significant. *Roe v. City & County of San Francisco,* 109 F.3d at 586 (internal quotation marks omitted); *see Johnson v. Multnomah County, Or.,* 48 F.3d 420, 424, 426 (9th Cir.1995) (recognizing that the "First Amendment interest in protecting recklessly false statements" is "very limited" but holding that "the recklessness of the employee and the falseness of the statements should be considered ... as part of the *Pickering* balancing test," not the public concern test).

Roe's videos do not fall within that unprotected category of personnel disputes and grievances. The dissent maintains, however, that Roe's failure to remove his seller's profile on eBay does pertain to a personnel dispute because "it expressed disdain or disregard for the employment restrictions placed upon him by his supervisor." *Post* at 1127. On a motion to dismiss for failure to state a claim, we must draw all reasonable inferences in favor of the non-moving party. *See Everest & Jennings, Inc. v. Am. Motorists Ins.*

*Co.,* 23 F.3d 226, 228 (9th Cir.1994). Aside from the fact that the defendants do not advocate the dissent's inference, nothing in Roe's complaint suggests that his failure to take down his seller's profile was intended as an expression of protest against the Department's restrictions. Moreover, we doubt that any viewer who saw Roe's seller profile on eBay understood it to reflect a grievance about the San Diego Police Department's restrictions, especially when the profile does not associate the seller with the Department. *Cf. Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (concluding that conduct expressed a particular message where "[a]n intent to convey [that] particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.").[10]

With respect to the form and context of the speech, Roe's videos were made and distributed "outside the workplace." *NTEU,* 513 U.S. at 466, 115 S.Ct. 1003. In addition, Roe did not choose to address "audiences composed of co-workers or supervisors." *Id.* at 465, 115 S.Ct. 1003. Rather, Roe's expression was directed to "segments of the general public." *Id.* He sold the videos on a public and widely used auction site, and the Internet itself is a medium that reaches a diverse and widespread audience. Thus, Roe's choice of medium and audience indicates that he was speaking as a member of the general public rather than as an employee.

In addition to the content, form and context, we have also looked to the em-

---

**10.** Moreover, as the dissent recognizes, Roe was terminated in part for the *content of his videos,* not just disobedience for failing to take down his seller's profile. *See post* at 1124–1125. Indeed, Roe has alleged that the content of his videos was the *principal* reason for his termination. At this procedural stage, we must accept this fact as true. *See Zimmerman*

*v. City of Oakland,* 255 F.3d 734, 737 (9th Cir.2001). The Department will have ample opportunity to prove on remand under the mixed motive analysis of *Mt. Healthy* that it would have fired Roe for disobedience or outside employment regardless of his expression. *See Umbehr,* 518 U.S. at 685, 116 S.Ct. 2361.

ployee's "motivation" for speaking. *Ulrich*, 308 F.3d at 979; *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir.2002). We have cautioned that "motive should not be used as a litmus test for public concern; rather, content is the greatest single factor." *Havekost*, 925 F.2d at 318 (internal quotation marks omitted). The dissent maintains that Roe's speech was furthering a "purely private interest" because his speech was "intended to facilitate his outside business activities." *Post* at 1128. That may be true, but profit or commercial gain is not the type of motivation that the public concern test screens from protection. As the Supreme Court has recognized, "compensation provides a significant incentive toward more expression." *NTEU*, 513 U.S. at 469, 115 S.Ct. 1003. In *NTEU*, the employees gave lectures and wrote articles in exchange for substantial honoraria—as much as $3,000 per year for some employees—in order to supplement their income. *Id.* at 461–63, 115 S.Ct. 1003. Notwithstanding that the employees were motivated by monetary gain, the Supreme Court concluded that such speech fell "within the protected category of citizen comment on matters of public concern." *Id.* at 466, 115 S.Ct. 1003.

In sum, Roe's expressive conduct was not about private personnel matters, was directed to a segment of the general public, occurred outside the workplace and was not motivated by an employment-related grievance. Thus, he was not speaking as an employee on matters related to his personal status in the workplace. Under the public concern test, Roe's expressive conduct does not fall within an unprotected category of speech, so the district court erred in dismissing his First Amend-

ment claim without proceeding to *Pickering* balancing.

### D.

Our holding does not render the Department powerless to act against Roe for his off-duty, non-work-related conduct. Rather, whether Roe's speech is ultimately entitled to protection will depend on the *Pickering* balancing phase.[11] In that step, the free speech interests in Roe's expressive activity must be weighed against the Department's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *see also Rankin*, 483 U.S. at 388, 107 S.Ct. 2891; *Waters*, 511 U.S. at 673, 114 S.Ct. 1878; *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1200–02 (9th Cir.2000); *Gilbrook v. City of Westminster*, 177 F.3d 839, 867–69 (9th Cir.1999) (identifying various factors that weigh in the balance); *cf. Melzer*, 336 F.3d at 197–99 (applying the balancing test in a similar context). Alternatively, under *Mt. Healthy*, the Department can prevail on Roe's First Amendment claim if it proves by a preponderance of the evidence that it would have terminated Roe regardless of his expression. *See Umbehr*, 518 U.S. at 685, 116 S.Ct. 2361. Because the district court did not reach the *Pickering* balancing phase or the *Mt. Healthy* mixed motive analysis, we remand to the district court for further proceedings.

**REVERSED and REMANDED.**

WARDLAW, Circuit Judge, dissenting.

I respectfully dissent.

Today the majority announces that any speech by a public employee is protected

---

11. Federal courts will not necessarily have to "sit in judgment over every adverse employment action," as the dissent asserts. *Post* at 1129. Suits may still be dismissed for failure to state a claim or on summary judgment under the *Pickering* balancing test, which is a question of law for the court. *See Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir.2001).

as a matter of public concern from an adverse employment decision so long as it "does not fall within an unprotected category of speech," "was not about private personnel matters, was directed to a segment of the general public, occurred outside the workplace and was not motivated by an employment-related grievance." *Ante,* at 1121, 1122. The majority's new connect-the-dots public concern test flatly ignores the nature and content of the expressive conduct at issue in this case, and so dilutes the "public concern" threshold for application of the *Pickering* balancing test as to read it out of existence. Although the majority purports to divine its sweeping new rule from *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), that case involved neither an adverse employment decision by the government as employer nor the public concern test. Because the majority's astonishing new rule disregards the content of public employee speech and blurs the distinction between the government's exercise of power as employer rather than sovereign, it directly contravenes the public employee speech doctrine developed in *Pickering v. Board of Education,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), as well as a host of Ninth Circuit cases defining the type of speech that rises to the level of "public concern."

Applying its new version of the public concern test to the facts of this case, the majority holds that the San Diego Police Department ("SDPD") is required to justify in federal court its decision to fire Roe for violating departmental regulations by offering for sale over the internet an SDPD uniform and offering and selling videotapes of himself stripping off a police uniform and masturbating. I simply cannot agree to a new rule of law that produces such an absurd result.

**I**

Because the district court dismissed this action at the pleading stage, we must accept as true the facts alleged in Roe's complaint and construe them in the light most favorable to him. *See Transmission Agency v. Sierra Pac. Power Co.,* 295 F.3d 918, 932 (9th Cir.2002). This does not mean, as the majority apparently believes, that we may overlook allegations in Roe's complaint (ER 1–18) that are harmful to his case. Accurately set forth, the facts make clear that Roe's expressive conduct was both related to his job and not on a matter of public concern.

Roe was formerly employed as an officer of the SDPD. ER 2. During his tenure, he produced, offered for sale, and sold through the adults-only section of the eBay internet auction site videotapes depicting himself stripping off a police uniform and masturbating. ER 4–6. He also offered for sale police uniforms formerly used by the SDPD and the National City Police Department. ER 3. Roe utilized the eBay username "Code3stud@aol.com" and described himself in his seller's profile as being "in the field of Law Enforcement." ER 3, 6. He included his picture in the listings of the items he offered for sale. ER 5.

Another SDPD officer discovered Roe's internet marketing activities through an eBay search. ER 3. In linking to Roe's adults-only listings, the officer had to "certify" that he did not find "pornographic images of nude adults, adults engaged in sexual acts or other sexual material to be offensive or objectionable." ER 4. As part of the SDPD's further investigation of Roe's activities, a different SDPD officer purchased from Roe a pair of men's briefs and one of his videos. ER 8. That officer

also emailed to Roe a request for a custom made video for a friend wherein Roe would pretend to be issuing the friend a citation and would "strip down while writing the ticket and make [the friend] a deal to take it back, which would end up with [Roe's masturbation]." ER 9. Roe made the customized tape, and sold and shipped it to the undercover officer. *Id.* Roe was later interviewed as part of the investigation and admitted to all of the foregoing conduct. ER 9–10.

Following the investigation, the SDPD Professional Standards Unit determined that Roe had violated three department policies—Unbecoming Conduct, Immoral Conduct, and Outside Employment. ER 10. Roe's captain ordered him to cease such activities. *Id.* Nevertheless, Roe maintained his eBay seller's profile, which included a description and the prices of his first two videos, as well as the price for a custom-made video. ER 10–11. After discovering this, the SDPD, citing a fourth policy—Obedience to Lawful Orders—began termination proceedings against Roe, which culminated in the June 29, 2001 Notice of Termination for violation of all four policies. ER 11–13.

Roe sued in federal court, contending that his termination violated his First Amendment rights. Judge Keep correctly held that Roe failed to demonstrate how offering actual police uniforms for sale and producing, marketing, and selling sexually explicit videos for commercial profit is "speech on a matter of public concern" as defined in *Connick,* 461 U.S. at 138, 103 S.Ct. 1684, and *Rendish v. City of Tacoma,* 123 F.3d 1216 (9th Cir.1997), and granted summary judgment for the SDPD.

## II

Analytically, the first question is whether Roe was terminated for exercising his right to free speech at all. After all, the SDPD terminated Roe for violations of four department policies directed to *conduct,* not speech. Roe was not fired for making, possessing, or viewing his videos; he was fired for selling them. On the other hand, only one of the three department policies at issue seems exclusively related to the marketing of the videos and other pornographic paraphernalia (Outside Employment). The other policies do tend to reach the subject matter of the videos themselves, i.e., Roe stripping off a police uniform and masturbating. Therefore, I do not take issue with the majority's conclusion that there is some minimally expressive activity at issue. The question then is whether that expressive activity rises to the level of public concern such that the government may be hauled into federal court to justify its decision to terminate Roe.

That is the threshold question in any public employee speech case. *See Connick,* 461 U.S. at 146, 103 S.Ct. 1684. It is the *employee* who bears the burden of demonstrating that "her speech was constitutionally protected—that it addressed a matter of public concern." *Pool v. VanRheen,* 297 F.3d 899, 906 (9th Cir.2002). This threshold question is the only question the district court decided and the only question presented here.

Instead of simply answering this question, the majority digresses to ask and answer its own questions, e.g., "[W]hether Roe's status as a public employee effectively means he has no First Amendment protection even though his expressive conduct occurred off-duty, away from the workplace and said nothing about Roe's government employment or employer"; and "[J]ust *how* broad [is the government's power as employer] in the specific context of off-duty, non-job-related speech[?]" *Ante,* at 1114, 1118 n. 6. Questions such as these mischaracterize the actual content of Roe's speech and are utterly irrelevant to

whether Roe's expressive conduct was speech on a matter of public concern. Indeed, if Roe's expressive conduct was not on a matter of public concern, he has not been deprived of any First Amendment protection at all.

Although this threshold showing must be made in every public employee speech case, the majority treats it here as an alternative rather than a required approach. But the cases the majority references in its lengthy string-cite, *ante*, at 1119 n. 8, and elsewhere all make clear that a federal court may not resort to *Pickering* balancing until it first decides that the speech at issue is on a matter of public concern. *See, e.g., Melzer v. Bd. of Educ.*, 336 F.3d 185, 196 (2d Cir.2003) (*assuming a matter of public concern*); *Pappas v. Giuliani*, 290 F.3d 143, 146–48 (2d Cir.2002) (same); *Tucker v. Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir.1996) ("Here, the speech is religious expression and it is obviously of public concern."); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026–28 (7th Cir.1994) (same, noting "[t]he courts have had to separate speech that is *not very valuable socially* from whistleblowing and other socially valuable expressive activities of public employees, and 'matter of public concern' is the label of the distinction") (emphasis added); *Berger v. Battaglia*, 779 F.2d 992, 998–1002 (4th Cir.1985) (holding speech touched on a matter of public concern).

The majority's reliance upon *Flanagan v. Munger*, 890 F.2d 1557, 1562–67 (10th Cir.1989), is particularly unfortunate. *Flanagan* disregarded the well-established public concern test in favor of its own "protected expression" test for a public employee's "nonverbal expression that does not occur at work or is not about work." *Id.* at 1564. In the 14 years since *Flanagan* was decided, no other circuit has adopted this approach. This is not surprising, as *Flanagan* directly conflicts with the

teachings of *Pickering, Connick,* and their progeny. *See* discussion, *infra,* at 1129.

Where, as here, the public employee's speech is not on a matter of public concern, our "intrusive oversight" of the government's employment decision "in the name of the First Amendment" must end. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. As the Supreme Court reiterated fifteen years after *Pickering:*

> *Pickering,* its antecedents and progeny, lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, *it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.* Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Id.* (emphasis added).

## III

Whether public employee speech is on a matter of public concern is a question we review *de novo,* "looking to the 'content, form, and context of a given statement, as revealed by the whole record.'" *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 978 (9th Cir.2002) (quoting *Connick,* 461 U.S. at 147–48 & n. 7, 103 S.Ct. 1684).

## A

"Content is the greatest single factor in the *Connick* inquiry." *Havekost v. United States Dep't of Navy*, 925 F.2d 316, 318 (9th Cir.1991). *See also Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir.2001) ("First and foremost, we consider the content of the [public employee's] speech."). In this regard, we have consistently held that public employee speech is on a matter of public concern "if it helps citizens to make informed decisions about the operation of their government." *Roe v. City & County of San Francisco*, 109 F.3d 578, 584 (9th Cir.1997); *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983). Thus, where public employee speech is "of no relevance to the public's evaluation of the performance of governmental agencies, that speech ... receives no protection under the First Amendment." *Ulrich*, 308 F.3d at 978 (citing *Pool*, 297 F.3d at 907; *McKinley*, 705 F.2d at 1114). "In other words, [to qualify for First Amendment protection] the content of the communication must be of broader societal concern," with the focus on "whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Roe v. City & County of San Francisco*, 109 F.3d at 585.

Other circuits have reasoned similarly. *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1158–59 (11th Cir.2002) (analyzing public concern by inquiring whether the speech at issue is "the sort of public discourse which the First Amendment was intended to protect"); *Hardy v. Jefferson Community Coll.*, 260 F.3d 671, 678 (6th Cir.2001) ("The [public concern] distinction is based upon the principle that 'speech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection.'" (quoting *Connick*, 461 U.S. at 145, 103 S.Ct. 1684)); *Azzaro v. County of Alle-*

*gheny*, 110 F.3d 968, 977 (3d Cir.1997) (en banc) ("Given that the basis for the special protection accorded public concern speech is its instrumental value to the community in enabling self-governance, a court asked whether public employee's speech relates to a matter of public concern must determine whether expression of the kind at issue is of value to the process of self-governance."). *See also* Toni M. Massaro, *Significant Silences: Freedom of Speech in the Public Sector Workplace*, 61 S. Cal. L.Rev. 1, 4, 20 n. 95 (1987) (recognizing that "courts defer broadly—often decisively—to the government employer's need for disciplinary discretion" and collecting cases where employee speech was not found to address a public concern).

The majority argues that these cases are inapposite because Roe's expressive conduct was supposedly "unrelated to work" and thus not the type of speech the public concern test was meant to preclude. *E.g., ante*, at 1119–1120. In making this determination of law, the majority inexplicably chooses to cite the SDPD's brief, *ante*, at 1112 n. 4, 1120, rather than analyze the allegations of Roe's complaint, in which Roe claims that while he was employed as an officer in the SDPD: (1) he offered for sale police uniforms formerly used by the SDPD and the National City Police Department; (2) he produced and sold videotapes depicting himself stripping off a police uniform and masturbating; (3) he produced and sold a custom-made video depicting himself in uniform issuing a citation then stripping off his uniform and masturbating; (4) his eBay username referenced "Code3," a commonly understood high-priority police radio call; and (5) he described himself in his seller's profile as being "in the field of Law Enforcement." Obviously, the whole point of Roe's internet marketing activities was that his items were "genuine" because they were being offered for sale by the actual police officer

pictured in the seller's profile; he used the fact that he was a police officer to market his wares. Moreover, the majority's argument that Roe's expressive conduct was not "in any way about the San Diego Police Department" and "[did] not associate [Roe] with the Department," *ante,* at 1120, 1121, is simply at odds with Roe's alleged facts: Roe offered for sale an actual SDPD officer's uniform. These internet marketing activities caused concern at the SDPD because, among other reasons, such activities would compromise Roe's authority and the safety of others in carrying out his duties as a police officer. Contrary to the majority's myopic interpretation of what "relates" to one's job, Roe's expressive conduct plainly related to his job.

The majority also tries to distinguish the myriad public employee speech cases on the ground that the public concern test does not preclude Roe's expressive conduct because his speech did not involve a workplace grievance. *Ante,* at 1115–1117, 1120–1121. But the majority forgets that Roe was terminated for, among other reasons, outside employment and disobeying the orders of his captain. By continuing to maintain his eBay seller's profile after his captain ordered him to remove it, Roe's expressive conduct pertained to his job in that it expressed disdain or disregard for the employment restrictions placed upon him by his supervisor, i.e., a personnel dispute or workplace grievance. In any event, the cases referenced above from this circuit and others are relevant because they establish that public employee speech must be of "broader social concern" to receive First Amendment protection from adverse employer action.

The majority purports to buttress its argument with extensive quotation, *ante,* at 1119–1120, from *Berger v. Battaglia,* a nearly twenty-year-old Fourth Circuit case. 779 F.2d at 992. But the majority conveniently brushes aside a critical aspect of that decision. *Berger* held that an off-duty police officer's public, "blackface" musical performances were a matter of public concern because, *inter alia,* those performances were "a form of artistic expression." 779 F.2d at 997. *See also Tindle v. Caudell,* 56 F.3d 966, 970 (8th Cir.1995) (distinguishing *Berger* and holding a Halloween costume was not speech on a matter of public concern because "[a]rtistic expression before a public audience is quite different from a decision to wear a costume to a private Halloween party. Here there were no public performances, and there is little in the record to suggest there was much entertainment value in Tindle's appearance."). Of course, neither Roe nor the majority argues that Roe's videos are a form of artistic expression. Thus, whether *Berger* "viewed artistic expression broadly," *ante,* at 1119 n. 7, is irrelevant. *Berger* is inapposite.

Under these precedents, Roe's expressive conduct plainly does not rise to the level of "speech on a matter of public concern." Even Roe does not assert that his videos convey such speech. Indeed, he does not argue that his video masturbation communicates any idea at all. *Cf. Tindle,* 56 F.3d at 970 ("Tindle does not claim he intended to comment on any issue of interest to the public.... [Entertaining] other guests at a private party [by wearing an amusing costume] with no showing of any intended message is not speech on a matter of public concern."). Rather, Roe argues that we need not apply the public concern test, urging us instead to follow the misguided *Flanagan* approach. Simply put, Roe's videos do not contain material "of broader societal concern" such that they should be accorded "the highest degree of First Amendment protection." *Roe v. City & County of San Francisco,* 109 F.3d at 584–85 (citing *McKinley,* 705 F.2d at 1114).

**B**

Another "critical inquiry is whether the employee spoke in order to bring wrongdoing to light or merely to further some purely private interest." *Havekost,* 925 F.2d at 319. "[I]f the [public employee's speech] is essentially self-interested, with no public import, then it is ... not of sufficient concern to the general public to trigger First Amendment scrutiny." *Roe v. City & County of San Francisco,* 109 F.3d at 585. Where the government disciplines a public employee for private-interest speech, " 'a federal court is not the appropriate forum' in which to review the [employment decision]'absent the most unusual circumstances.' " *Id.* (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).

Here, Roe's expressive activity, although conveyed via the internet, was in actuality directed to the private individual consumer of his products rather than the general public. His "speech" was not intended to bring some government mischief to light or to inform or otherwise enlighten the public; it was intended to facilitate his outside business activities—a "purely private interest." The majority assumes its own conclusion when it asserts that commercial gain "is not the type of motivation that the public concern test screens from [First Amendment] protection" because "compensation provides a significant incentive toward more expression." *Ante,* at 1122 (another out-of-context quote from *NTEU,* 513 U.S. at 469, 115 S.Ct. 1003). If the employee's expressive conduct is not a matter of public concern, as is the case here, it is not protected by the First Amendment and there is no relevant incentive toward expression.

Thus, analysis of Roe's motivation also makes clear that his videos are not entitled to the First Amendment protections reserved to public employees for speech on a matter of public concern.

**C**

Roe simply has not met his burden of showing that the "content, form, and context" of his expressive conduct meets the public concern threshold. Although the majority employs many euphemisms to describe the content of Roe's videos, e.g., "sexually explicit but not obscene," "crude and sexually explicit," but "within the broad realm of protected expression," *ante,* at 1110, 1112, 1113, 1120, Roe himself alleges that his videos are pornography—a more accurate, and honest, assessment. But displaying, offering to sell, and selling pornography may not be honestly considered "as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. Roe's "speech" is of no more "concern to the community" than any other private commercial transaction involving pornography.

The pornographic nature of Roe's videos is highly relevant because it establishes under our precedent that Roe's speech is not on a matter of public concern. Although the majority appears to suggest that this dissent is founded upon a view that Roe's videos are "distasteful or discomforting" or because Roe's videos "offend our sensibilities," *ante,* at 1120–1121, such speculation does not advance the majority's argument. Whether Roe's "distasteful or discomforting" videos would otherwise be protected by the First Amendment misses the point entirely. Because Roe's videos "cannot be fairly characterized as constituting speech on a matter of public concern," *Connick,* 461 U.S. at 146, 103 S.Ct. 1684, Roe's First Amendment rights have not been violated and the SDPD should not be required to justify in federal court its decision to terminate him.

**IV**

The majority contends that a new definition of the public concern test is warranted

here because Roe's expressive conduct (purportedly) did not relate to his job and was not about personnel matters; occurred outside of work; and was "directed to a segment of the general public." *Ante,* at 1121–1122. Applying its new test, the majority boldly concludes, without citing a single case, that speech is a matter of public concern and *Pickering* balancing is required so long as the speech meets these criteria and "does not fall within an unprotected category of speech" under the First Amendment. *Ante,* at 1122. Although it claims otherwise, the majority thus adopts the backward "protected expression" test that the Tenth Circuit invented in *Flanagan* as an "alternative" to the public concern test where a public employee's "nonverbal protected expression does not occur at work and is not about work." 890 F.2d at 1564. No other court has employed *Flanagan*'s "protected expression" approach, and no court has been so bold as to try to recast it as a modified public concern test—until now. *See ante,* at 1120 n. 9.

The majority's misguided, misnamed approach misapprehends why there is a public concern test in the first place. The test exists to exempt from employer discipline public employee discourse at the "highest" level of protected speech—not the lowest level. *Roe v. City & County of San Francisco,* 109 F.3d at 584–85 (citing *McKinley,* 705 F.2d at 1114). It exists because if there were not a threshold of protected speech, the public employer would be free to fire an employee for any speech of which the employer disapproved, including speech on matters of great public import. To assert, again without any authority, that a public employee may engage in the full range of protected speech free from consequence ignores Supreme Court and our own jurisprudence, which have carved out from the prospect of public employer discipline only a segment of protected speech. The majority turns the doctrine

of public employee speech on its head— Katie, bar the door!—for the federal courts now will sit in judgment over every adverse public employee action involving not speech on a matter of public concern, but speech in the slightest.

Nor does *NTEU,* 513 U.S. at 454, 115 S.Ct. 1003, further the majority's cause. In *NTEU,* the Supreme Court struck down the Ethics in Government Act's ban on receipt of honoraria by federal government employees for various speech activities. In its discussion of *NTEU,* the majority acknowledges that the public concern issue "was not the central issue in the case." *Ante,* at 1118. In point of fact, it was not at issue in the case at all. Public employees had submitted affidavits describing their compensation for past speech activities that would be prohibited under the honoraria ban, which activities included lectures on the Quaker religion and Russian and African–American history, and articles and appearances reviewing dance performances and the environment. *NTEU,* 513 U.S. at 461–62, 115 S.Ct. 1003. Not surprisingly, the government never sought to defend the statute against the employees' First Amendment challenges on the ground that these speech activities did not involve matters of public concern. Accordingly, the Court never expressly reached the issue, implicitly finding the speech activities on matters of public concern and proceeding to evaluate the statutory ban under a *Pickering* balancing test. *Id.* at 464–72, 115 S.Ct. 1003.

The Supreme Court was not asked in *NTEU* to revisit its public concern holdings, and it did not "appl[y] the public concern" test. *Ante,* at 1117. The majority plays fast and loose with Supreme Court precedent when it cites the D.C. Circuit's opinion in *NTEU* and baldly asserts that "[t]he Supreme Court did not disagree"

with that court's limited discussion of the issue. *Ante*, at 1118. That hardly constitutes a holding on the question of public concern. Therefore, *NTEU* does not provide any basis for the majority's newly minted public concern test.

Moreover, extracting convenient, abstract "compartments" of speech, e.g., "speaking as citizen, not as government employee," "addressed to a public audience," "largely unrelated to government employment," and "of interest to a segment of the general public," from *NTEU* to fashion a new bright-line public concern test is analytically incorrect. In the context of public employee speech, we have warned against "the 'dangers of reducing the First Amendment to a series of doctrinal cubbyholes' and of 'warping different fact situations to fit into the boxes we have created.'" *Roe v. City & County of San Francisco*, 109 F.3d at 586 (quoting *Tucker v. Cal. Dept. of Ed.*, 97 F.3d 1204, 1209 (9th Cir.1996)). *See also Weeks*, 246 F.3d at 1234 ("Fortunately, [in analyzing whether speech is on a matter of public concern,] we have avoided multi-part tests that would shoehorn communication into ill–fitting categories.").

It is this impermissible "fact warping" and "shoehorning" that elevates form over substance, allowing the majority absurdly to conclude that "Roe's expressive activities—as crude as they may appear—... fall[ ] within the protected category of citizen comment on matters of public concern, rather than employee comment on matters related to his personal status in the workplace." *Ante*, at 1112. This holding demeans the "significant contributions to the marketplace of ideas" by public employees, which are properly protected under the First Amendment. *NTEU*, 513 U.S. at 455–56, 115 S.Ct. 1003 (noting that Nathaniel Hawthorne, Herman Melville, Walt Whitman, and federal employees of lesser literary stature did not and do not "relin-

quish[ ] the First Amendment rights they would otherwise enjoy as citizens to comment *on matters of public interest*") (emphasis added). Freed from the cubbyholes and analyzed as a whole, Roe's pornographic videos do not involve a matter of public concern as heretofore defined.

## V

Rather than relying on *NTEU*, the majority should have turned for guidance to Justice O'Connor's opinion in *Waters v. Churchill*, 511 U.S. at 661, 114 S.Ct. 1878, which involved a public employee disciplined for her speech and discussed the fundamental rationale that animates the public concern test: "[T]he government's role as employer ... gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large[.]" *Id.* at 671, 114 S.Ct. 1878. As Justice O'Connor explained:

[This principle] is amply borne out by considering the practical realities of government employment, and the many situations in which, we believe, most observers would agree that the government must be able to restrict its employees' speech.... [E]ven many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees.

*Id.* at 672, 114 S.Ct. 1878. *See also Rendish*, 123 F.3d at 1219 ("[T]he State's interest in regulating the speech of its employees differs significantly from its interest in regulating the speech of its citizenry.").

For example, *Waters* recognizes that "[e]ven something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees." *Id.* Similarly, although speech restrictions must "generally precisely define the speech they target," *Waters* recognizes that "a public employer

may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Id.* at 673, 114 S.Ct. 1878.

Further elaborating on this important distinction, *Waters* acknowledges the well-established principle that should govern our decision here:

> [W]e have refrained from intervening in government employer decisions that are based on speech that is of entirely private concern. Doubtless some such speech is sometimes nondisruptive; doubtless it is sometimes of value to the speakers and the listeners. But we have declined to question government employers' decisions on such matters.

*Id.* at 674, 114 S.Ct. 1878 (citing *Connick,* 461 U.S. at 146–49, 103 S.Ct. 1684).

The lesson of *Connick* and *Waters* is that the government's power as employer is broader than its power as sovereign. "The key to First Amendment analysis of government employment decisions [is that] the government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters,* 511 U.S. at 675, 114 S.Ct. 1878. *See also Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (recognizing that a government employer may restrict speech that would otherwise not lie "beyond the protection of the First Amendment").

Roe's purely private expressive conduct is protected by the First Amendment. The government could not enact a law prohibiting him from making and selling his videos. But under *Connick, Waters,* and the relevant SDPD employment regulations, if Roe wishes to be an officer in the SDPD, he is subject to termination for speech within the ambit of the First Amendment, but which does not involve a matter of public concern. That employment decision lies within the sound discretion of the police department, not a federal court sitting as the "Supreme Civil Service Commission." SDPD's Brief at 16. All this means is that Roe's First Amendment rights are those of an ordinary employee, subject to the rules and regulations of his employer. The mere fact that Roe is a public employee does not gain him greater First Amendment protection than the ordinary citizen subject to the ordinary dismissal. This critical point appears to be totally lost on the majority. *See ante,* at 1118 n. 6.

\* \* \*

The nature and content of Roe's speech determines whether Roe's termination is subject to First Amendment review. Because Roe's speech "cannot be fairly characterized as constituting speech on a matter of public concern, the First Amendment is inapplicable and the court need not scrutinize the reasons for any adverse actions." *Ulrich,* 308 F.3d at 977–78 (citing *Connick,* 461 U.S. at 146, 103 S.Ct. 1684). Remand for analysis under *Pickering* or *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), is therefore unwarranted, and I would affirm the district court.