ALPHA ENERGY SAVERS, INC., an Oregon corporation; Robert Obrist, Plaintiffs–Appellants,

v.

Diane HANSEN; Multnomah County; Judy Swendsen, Defendants–Appellees.

No. 03–35142.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 2004.

Filed Aug. 27, 2004.

Daniel J. Snyder, Portland, OR, for the plaintiffs-appellants.

Susan M. Dunaway, Portland, OR, for the defendants-appellees.

Before REINHARDT, SILVERMAN, and CLIFTON, Circuit Judges.

REINHARDT, Circuit Judge.

This case requires us to consider the scope of constitutional protection afforded to public contractors who serve as witnesses in judicial and administrative proceedings. Robert Obrist testified at a grievance hearing, and filed an affidavit and agreed to be listed as a witness in a

federal discrimination lawsuit, on behalf of a former employee of Multnomah County. The County and two of its employees, Diane Hansen and Judy Swendsen (collectively referred to as "the defendants"), allegedly retaliated against Obrist by manipulating the County's contracting procedures in order to deny work to his company, Alpha Energy Savers, Inc.

The district court granted summary judgment for the defendants on the ground that Obrist's expressive conduct did not touch upon a matter of public concern and, thus, could not support a First Amendment retaliation claim under 42 U.S.C. § 1983. We reverse that ruling against Obrist and Alpha (collectively referred to as "the plaintiffs"). We also reverse the district court's grant of summary judgment on the plaintiffs' supplemental Oregon state law claim of intentional interference with contractual relations.

## I. Background

For over ten years, Alpha has contracted with Multnomah County to provide insulation and other energy-saving weatherization services for the homes of low-income residents.[1]

In a series of multi-year agreements with the County, Alpha and other vendors each specified the prices that they would charge (i.e.bid) for various types of weatherization services.[2] When a qualified low-income resident requests assistance, the County weatherization department conducts an audit to determine what specific services are required. Then, the County awards the job to the contractor who submitted the lowest bid for the particular combination of services—unless one of several exceptions applies (e.g. the lowest bidder exceeded its bonding limit or the weatherization department determines that the job is appropriate for the County's welfare-to-work crew).

In April 1999, Curtis Stephens, a former employee of the County weatherization department, subpoenaed Robert Obrist, Alpha's president and sole owner, to testify at a hearing before the Oregon Employment Relations Board. Stephens alleged that his union, Oregon AFSME Council 775, breached its duty of fair representation by failing to investigate and pursue a grievance against the County, which, he alleged, had wrongfully discharged him. The County's stated reason for terminating Stephens was that he falsified weatherization audits. According to Stephens, these charges were fabricated by Judy Swendsen and Diane Hansen, two weatherization department employees who, he contended, were biased against him on account of his age and race. At the time that he was fired, Stephens was the oldest employee and the only black in the County weatherization department.[3]

1. The defendants made a motion to strike portions of the affidavits that the plaintiffs filed in opposition to summary judgment. The following factual summary does not rely upon any of the challenged paragraphs unless the district court explicitly denied the defendants' motion with respect to the information contained therein. Here, as in all summary judgment cases, we view the facts in the light most favorable to the non-moving party and accept its version of any disputed facts. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003).

2. One set of vendor contracts ("the 1996 contracts") covered the period between July 1996 and February 2000 and was ultimately extended through June 30, 2000. Another set of contracts went into effect on July 1, 2000 ("the 2000 contracts").

3. During the relevant time period, Swendsen inspected contractors' work for compliance with program specifications. Hansen's official job responsibilities included: processing residents' applications for weatherization services, sending work orders to contractors, and maintaining files for each job. According

At the grievance hearing, Obrist testified that he had never experienced any problems with the weatherization audits conducted by Stephens, recounted critical comments that Hansen and Swendsen had made about Stephens and his work, and expressed his opinion that Hansen and Swendsen "manipulated" the County weatherization program: "it's either their way or the highway, there's no gray areas." On cross-examination, Obrist complained that Stephens was not the only victim of unfair treatment by Hansen and Swendsen; he testified that the two employees were also responsible for failing to award Alpha weatherization contracts to which it was entitled as the lowest bidder.

In addition to his testimony before the Oregon Employment Relations Board, Obrist also came to Stephens's aid when Stephens filed suit against the County in federal court alleging race and age discrimination. In November 1999, Obrist submitted an affidavit stating that Stephens's "work was as good as [that of] anyone else in the weatherization department," that Swendsen and Hansen were "very biased" toward Stephens, and that they "worked toward the goal of getting [him] out of the weatherization department." Obrist also agreed to testify on Stephens's behalf, and the contents of his affidavit were summarized in the witness statement that Stephens filed in December 1999. Ultimately, however, Obrist was not required to testify because the County settled with Stephens for "a large sum of money."

In the same period that Obrist was providing assistance to Stephens, he was also pursuing his own claim against the County for unfair treatment. Beginning in February 1999, Obrist complained to various County personnel that Alpha was being denied work to which it was entitled. An investigation conducted by Assistant County Attorney John Thomas determined that the weatherization department had not always awarded jobs to the lowest bidder. Following Thomas's investigation, the weatherization department reformed its bidding procedures, and in February 2000, the County settled with Alpha for $18,800.[4] Alpha experienced a temporary spike in contract awards while the investigation was underway, but its share of the County jobs declined again after the settlement. In addition, Swendsen and other weatherization employees subjected Alpha's work to increasingly rigorous inspections.

Early in 2000, the County began drafting new master weatherization contracts to replace the existing versions that were scheduled to expire. At a weatherization staff meeting, Hansen stated that she intended to "Rob proof" the new contracts—an obvious reference to Robert Obrist. Hansen also confided to another County employee that she was "fixing it" so that Obrist would not receive further work from the County. Hansen and Swendsen helped revise provisions of the new contracts that increased the County's discretion not to award jobs to contractors that were the lowest bidders.[5] The new contracts were completed in June and put into

to the plaintiffs, Hansen was the de facto manager of the department because Cecile Pitts, the program manager, worked part-time and had little experience with the technicalities of weatherization services.

4. As part of the settlement, Alpha released the County and its employees for claims relating to its 1996 master contract. The plaintiffs do not appeal the district court's determination

that the settlement limits the defendants' potential liability in the present case to conduct that occurred after February 1, 2000, the date of the release.

5. The County insists that Assistant County Attorney Thomas was primarily responsible for the redrafting and that Hansen and Swendsen were only involved in technical aspects.

effect in July, when they were executed by the individual vendors, each of whom signed a separate agreement.

Alpha, like the other vendors, entered into one of the new agreements with the County and was pre-authorized for up to $100,000 in contract awards. However, it received only two of the 1,004 jobs that the County awarded through October 2002. According to other contractors and County personnel, Hansen and Swendsen tampered with files, altered bidding sheets, manipulated the department's computer database, and engaged in other schemes to direct work away from Alpha. Hansen and Swendsen also continued to make negative statements about Alpha, its owner, and its employees. For instance, Hansen called Obrist an "asshole" and the "anti-Christ" and stated on several occasions: "We don't want to give Obrist any jobs that he bid on."

Beginning in July 2000, Obrist expressed concerns about the new master contracts as well as ethical violations, fraudulent practices, favoritism, and mismanagement to Pitts, the department supervisor; Lolenzo Poe, the director of the County Department of Community and Family Services; and the U.S. Department of Energy, which funds the weatherization program. Then in September 2001, Alpha and Obrist filed suit.

The district court granted summary judgment for the defendants. The plaintiffs challenge its ruling on their First Amendment retaliation claim and on their state law tort claim of intentional interference with contractual relations, but not on their other supplemental claims.

## II. First Amendment Retaliation Claim

 When a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim under § 1983 using the same basic approach that we would use if the claim had been raised by an employee of the agency. *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 684–85, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). Accordingly, the contractor must establish that (1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action. *Roe v. City of San Diego*, 356 F.3d 1108, 1112 (9th Cir.2004). If the contractor meets its burden, the government officials (and the government itself) can nonetheless escape liability if they demonstrate either that: (a) under the balancing test established by *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh the contractor's free speech interests; or (b) under the mixed motives analysis established by *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), they would have taken the same actions in the absence of the contractor's expressive conduct. *Umbehr*, 518 U.S. at 675–76, 116 S.Ct. 2342; *Roe*, 356 F.3d at 1112.

 As a threshold matter, we agree with the district court that although Stephens's federal discrimination case was settled and Obrist was not required to appear in court, his expressive conduct includes not only the affidavit that he filed on Stephens's behalf and his testimony at the grievance hearing but also his agree-

However, Hansen stated in her deposition that she and Swendsen did much of the work.

ment to be listed as a witness in the judicial proceedings. "Non-verbal conduct implicates the First Amendment when it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) (quoting *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)); *see also Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir.2004). By agreeing to be listed as a witness, Obrist conveyed the "particularized message" that he intended to testify in support of Stephens's claim along the lines set forth in his affidavit and in the summary witness statement. *See Pro v. Donatucci*, 81 F.3d 1283, 1291 (3d Cir.1996) (holding that a public employee was not precluded from bringing a First Amendment retaliation claim simply because she was not called to testify when she appeared in court as a potential witness).

## A. Matter of Public Concern

 Whether a public employee or contractor's expressive conduct addresses a matter of public concern is a question of law. *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This determination is made in light of "the content, form, and context" of the expressive conduct "as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003) (internal quotations and citations omitted). In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies,

is generally not of public concern." *Id.* (internal quotations and citations omitted).

The district court concluded that Obrist's expressive conduct was "in the nature of a private grievance rather than a matter of public concern" because it determined that his primary motivation for providing assistance to Stephens was to curry favor with him in the hope that he might provide assistance in resolving Alpha's dispute with the County. The district court drew this conclusion from the union attorney's cross-examination of Obrist during Stephens's grievance hearing:

Q: Okay. In the course of your conversation with [Stephens's attorney] yesterday, did he tell you, "If you help us, we will help you?"

A: Well, basically, yeah, I mean when he called—I—when he called me I told him that I had a situation and I asked him if he had heard that I had a situation and he said that he had heard—you know, that I had some concerns about the County. He wouldn't tell me how he found out about it, so being that I had my situation going where I written [sic] a letter to the County, that I—if I would come down and help Curtis, and he could help me. But, again, like I told him I didn't really want to come here today, I wasn't sure if I should come here. I don't want to sue the County. Maybe—I mean maybe I should; I don't know. I mean I feel there has been some injustice done to me and I think I can make some people's lives miserable if I so choose to do that. But that's not really my desire. My desire in life is to get people to work together.

Stephens did subsequently provide assistance to Obrist by filing an affidavit on his

behalf detailing the weatherization department's wrongful treatment of Alpha. However, Obrist argues that his response at the grievance hearing, which might charitably be called discursive or rambling, was "far too ambiguous" to establish that his motivations for testifying were purely personal. He contends that, viewing the record in the light most favorable to him, it is reasonable to infer that he was motivated, at least in part, by a desire to expose discrimination, favoritism, and fraud within the County's weatherization department.

 Although Obrist's argument appears to have merit, we need not decide whether the district court erred in analyzing his motives for assisting Stephens because we have held that "motive should not be used as a litmus test for public concern; rather, content is the greatest single factor in the *Connick* inquiry." *Havekost v. U.S. Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir.1991) (internal quotation marks omitted); *accord Roe*, 356 F.3d at 1122. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court's leading case in this area, illustrates the role that motive plays in the public concern analysis. In *Connick*, a public employee alleged that her supervisors retaliated against her for distributing a questionnaire to coworkers. The Court concluded the employee's motive was, at least in part, "to gather ammunition for another round of controversy" in her individual personnel dispute. *Id.* at 148, 103 S.Ct. 1684. It held that the questions pertaining to office morale, the need for a grievance committee, and the office transfer policy did not address matters of public concern and, thus, declined to consider them further. However, it held that one of the questions—whether employees felt pressure to work on political campaigns— did address "a matter of interest to the community," *Id.* at 149, 103 S.Ct. 1684, and

proceeded to apply the balancing test to that part of the claim. If motive alone were critical, the Court would not have treated the political pressure question differently from the others listed in the questionnaire.

 "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest ... may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir.1995); *see also Pool v. VanRheen*, 297 F.3d 899, 907–08 (9th Cir.2002); *Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir.2001). This is, however, not a close case. The issue before the court in the case in which Obrist agreed to testify as well as at the grievance hearing—race and age discrimination by a governmental employer—was unquestionably a matter of public concern.

 We have previously held that proceedings before a judicial or administrative body constitute a matter of public concern if they bring to light potential or actual discrimination, corruption, or other wrongful conduct by government agencies or officials. *See Lytle v. Wondrash*, 182 F.3d 1083, 1087–88 (9th Cir.1999); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1223–24 (9th Cir.1997). Unlike the plaintiffs in the cited cases, Obrist was not a party to the grievance or lawsuit at issue. However, his testimony at the grievance hearing, as well as the affidavit that he filed and his agreement to be listed as a potential witness in Stephens's lawsuit, all helped expose discrimination and other wrongdoing by County personnel. Because the "subject matter" of Obrist's expressive conduct was not "only marginally related to issues of public concern," *Johnson*, 48 F.3d at

425, his motives for providing assistance to Stephens are of no relevance to the public concern inquiry.[6] The defendants argue that Obrist's expressive conduct does not merit constitutional protection. because Stephens, like the plaintiff in *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 420 (7th Cir.1988), did nothing "to distinguish this case from the run-of-the mine single-plaintiff discrimination case." In *Rendish*, we discussed a number of Seventh Circuit cases including *Yatvin*, before holding along with that Circuit that "in order to be constitutionally protected under either the Speech Clause or the Petition Clause, a public employee's actions must involve a matter of public concern." 123 F.3d at 1222. In following the Seventh Circuit, we rejected the Third Circuit's rule that under the Petition Clause public employees are protected against retaliation for having filed a lawsuit even if the lawsuit addresses matters of purely private concern. We did not, and do not now, however, adopt *Yatvin's* narrow view

that a "run-of-the mine single-plaintiff discrimination case" does not meet the public concern test. We have never required that discriminatory conduct or corruption must occur with regularity or any degree of frequency, or exceed some threshold of significance, in order to satisfy the public concern test. Rather, "[w]e have held that when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, . . . their speech is inherently a matter of public concern." *Ceballos v. Garcetti*, 361 F.3d 1168, 1174 (9th Cir.2004); *see also Voigt v. Savell*, 70 F.3d 1552, 1560 (9th Cir.1995). That rule applies to invidious discrimination as well—whether it consists of a single act or a pattern of conduct. Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole—conduct in which the public has a deep and abiding

---

**6.** We have assumed that witnesses are treated the same as parties for purposes of the public concern analysis. However, it is worth noting that other circuits are divided over whether the context of a courtroom appearance raises a public employee witness's testimony to the level of public concern, regardless of its content. The Third and Fifth Circuits hold that it does. *See Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 887 (3rd Cir.1997); *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir.1989). However, four other circuits have declined to adopt this per se rule. *See Arvinger v. Mayor & City Council of Baltimore*, 862 F.2d 75, 77–78 (4th Cir.1988); *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir.1994); *Padilla v. South Harrison R–II Sch. Dist.*, 181 F.3d 992, 996–97 (8th Cir.1999); *Maggio v. Sipple*, 211 F.3d 1346, 1352–54 (11th Cir.2000). Although the Tenth Circuit's approach is not entirely clear, it has cited Third and Fifth Circuit cases favorably and recognizes that "a witness's sworn testimony in a court proceeding is entitled to heightened protection under the First Amendment." *Ly-*

*tle v. City of Haysville*, 138 F.3d 857, 864 n. 2 (10th Cir.1998); *see also Worrell v. Henry*, 219 F.3d 1197, 1204–05 (10th Cir.2000). The Second Circuit, after noting that "[t]he paramount importance of judicial truth-seeking means that truthful trial testimony is almost always of public concern," declined to decide this issue in a recent case because, even under the more restrictive approach, the content of the employee's testimony supported a finding that the speech was of public concern. *Catletti ex rel. Estate of Catletti v. Rampe*, 334 F.3d 225, 230 (2d Cir.2003). We recently indicated that a public employee's speech in support of a co-worker's grievance may be treated differently than "employment grievances in which the employee is complaining about [his] *own* job treatment." *See Thomas*, at 808 (emphasis in the original). However, we need not decide whether a public employee witness's testimony is of public concern regardless of its content, because, as in *Catletti*, 334 F.3d at 230, the expressive conduct at issue here is of public concern even under the more restrictive approach.

interest. Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern.

The defendants contend that, even if Stephens's grievance hearing and lawsuit touched upon matters of public concern, Obrist's expressive conduct should not be afforded constitutional protection because it primarily "concerned obscure details of the technical aspects of County weatherization work." Obrist's testimony at the grievance hearing, and his affidavit and witness statement in the lawsuit, might have been technical, but they were offered to support complaints of racial and age bias. In the lawsuit, Stephens needed to introduce evidence explaining the mechanics of weatherization work in order to establish that he was a competent employee and, thus, rebut the County's assertion that he was fired on the basis of his deficient performance. Similarly, in the grievance hearing, Obrist's testimony was useful in showing that, had Stephens's union conducted a good faith investigation, it would have found that he had a legitimate claim of discrimination against the County. Were it the law that testimony regarding technical details could never satisfy the public concern test, public employees would likely be reluctant to serve as expert witnesses or divulge their specialized knowledge, such as explanations of quantitative data and technologically sophisticated processes, in cases involving discrimination, bribery, bid-rigging, or embezzlement, even though such testimony is often crucial in exposing the governmental wrongdoing at issue.

■ Accordingly, we hold that a public employee's testimony addresses a matter of public concern if it contributes in some way to the resolution of a judicial or administrative proceeding in which discrimination or other significant government misconduct is at issue—even if the speech itself would not otherwise meet the *Connick* test were we to consider it in isolation. *See Herts v. Smith*, 345 F.3d 581, 585–86 (8th Cir.2003) (holding that a school official's testimony in a desegregation lawsuit constituted a matter of public concern even though it included comments about her own employment situation); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1098 (5th Cir.1987) (holding that the plaintiff's "generally 'neutral'" testimony concerning the operation of a public program merited protection because the underlying suit sought to expose wrongdoing in that program).

■ Conversely, we conclude that the public concern doctrine may be implicated by the nature of the specific testimony, even if the judicial or administrative proceeding is not otherwise of public interest. Either one, the testimony or the proceeding, by itself, may be sufficient. Specifically, if a witness's testimony directly addresses governmental corruption or discrimination, it can satisfy the public concern test, even if it is offered in the course of a judicial or administrative proceeding that involves only purely private grievances or issues. *Cf. Thomas*, 379 F.3d at 809 (holding that a public employee's expressive conduct in support of a co-worker in her personnel dispute was a matter of public concern because it helped expose potential government misconduct). So long as either the public employee's testimony or the underlying lawsuit meets the public concern test, the employee may, in accord with *Connick*, be afforded constitutional protection against any retaliation that results.[7]

---

**7.** Because Obrist assisted in proceedings designed to expose discrimination by County employees, we need not decide whether his complaints on cross-examination during Ste-

## B. Actionable Adverse Actions

Because the district court determined that Obrist's expressive conduct did not address matters of public concern, it did not consider the other factors we must examine when analyzing First Amendment retaliation claims. The defendants argue that, even if the district court erred in its application of the public concern test, we should uphold summary judgment on the basis of the other factors. We disagree.

■ The defendants first argue that there is no evidence that the plaintiffs suffered any adverse action that is cognizable under § 1983. They contend that Alpha failed to win any contracts between August 2000 and September–October 2002 because its bids were higher than its competitors', not because of retaliation. However, the comparative summary of bid tabulations for the seven contractors that entered into 2000 master contracts reveals that there are several categories in which Alpha was either the lowest bidder or was within such a close range that it should have received at least some contracts if the lowest bidder was disqualified for some reason. Accordingly, the summary and other evidence in the record raise a genuine issue of fact as to whether the defendants subjected the plaintiffs to actions that were reasonably likely to deter Obrist from continuing to engage in First Amendment activity. See Coszalter, 320 F.3d at 975–76. At trial, the defendants will have the opportunity to prove that they would have taken the same actions even in the absence of a retaliatory motive but this issue is not appropriate for resolution at the present stage of the proceedings. See Ceballos, 361 F.3d at 1181.

phen's grievance hearing about his own unfair treatment by the County would have inde-

## C. Substantial or Motivating Factor

The defendants contend that the plaintiffs cannot meet their burden of establishing that retaliation was a substantial or motivating factor in the defendants' actions because there is no evidence that Hansen, Swendsen, or their superiors had any knowledge of the expressive conduct against which they allegedly retaliated. See Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 750–52 (9th Cir. 2001). Viewing the evidence in the manner that we must, the record reveals that even if Hansen and Swendsen were not aware of the precise content of Obrist's affidavit and witness statement, or of his testimony at the grievance hearing, they knew that he was supporting Stephens's actions against the County and that Stephens was asserting in these actions that they had discriminated against him. Finally, although Hansen and Swendsen were not present in the room when Obrist testified at Stephens's grievance hearing, he talked with them in the hallway outside. An Alpha foreman told Swendsen about the assistance that Obrist was providing to Stephens in his lawsuit. It is reasonable to infer that Hansen and Swendsen were aware that it was detrimental to their interests to have testimony in Stephens's grievance and lawsuit from someone like Obrist, who had publicly opposed their management practices in the past. Their knowledge of the precise details of his testimony is less crucial than their awareness that he assisted a former County employee who was publicly accusing them of racial and age discrimination. At the very least, there is a genuine issue of material fact regarding Hansen and Swendsen's knowledge of Obrist's expressive conduct.

pendently satisfied the public concern test.

The plaintiffs are required, however, to provide more than "mere evidence" that the defendants were aware of Obrist's expressive conduct in order to establish a genuine material dispute as to whether retaliation was a substantial or motivating factor for their conduct. *Keyser*, 265 F.3d at 751. In addition, the plaintiffs must: (i) establish proximity in time between Obrist's expressive conduct and the allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to his speech, either to him or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual. *Coszalter*, 320 F.3d at 977; *Keyser*, 265 F.3d at 751–52.

The defendants contend that a jury could not infer retaliatory intent on the basis of timing alone because the new Alpha contract went into effect in July 2000, more than seven months after Obrist filed an affidavit in Stephens's lawsuit in November 1999 and fifteen months after his testimony at the grievance hearing in April 1999. The defendants miscalculate, however. Planning for the new master contracts began in the early months of 2000, when the defendants began to revise the provisions of the old versions in order to "Rob proof" the new ones.

Accordingly, less than three months elapsed between the time when Obrist filed his affidavit and agreed to serve as a witness in Stephens's lawsuit and the time when the defendants began drafting the new anti-Obrist contracts. This period is within the three-to-eight-month time range that "easily" supports an inference of retaliation. *Coszalter*, 320 F.3d at 977. Nor is the approximately nine-month period between Obrist's testimony at the grievance hearing and the time planning commenced for the new contracts necessarily outside the acceptable range of proximity. We have declined to hold that any period is *per se* too long because there are a variety of reasons why retaliators choose to wait before acting. *Id.* at 977–78. In this case, the defendants obtained far greater discretion under the 2000 contracts to deny work to Alpha without revealing their retaliatory motives than they had under the 1996 contracts, especially after the County, by settling with Obrist, effectively conceded that there had been problems in the bidding practices under the old versions. The defendants point out that Alpha received more work in the nine months after Obrist testified at the Employment Relations Board than it did in the two years prior to the grievance hearing. However, this temporary increase serves only to illustrate further that the defendants may have strategically postponed their retaliation until after the new contracts, with their increased options for discretionary denial of work assignments, went into effect.

The plaintiffs also introduced evidence that the defendants expressed opposition to Obrist's expressive conduct, most notably, Hansen's statements that she intended to fix it so Alpha would not receive further work from the County. The defendants argue that this evidence does not establish their specific intent to retaliate against Obrist's expressive conduct as opposed to their long-standing personal animosity towards him as well as the low esteem in which they held Alpha's work. However, there is ample evidence that the anti-Obrist statements by Hansen and Swendsen increased in number and severity after Obrist provided assistance to Stephens. In any event, it is not fatal to the claim of a public employee or contractor that his expressive conduct may not be the only factor motivating the government officials to subject him to an adverse action. "As with proof of motive in other contexts, this element of a First Amendment retaliation suit ... involves questions of fact that

normally should be left for trial." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir.2002) (citing *Hunt v. Cromartie*, 526 U.S. 541, 542, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)). Accordingly, we hold that the plaintiffs have introduced sufficient evidence to establish that there is a material dispute as to whether retaliation was a substantial or motivating factor of the defendants' actions.[8]

### D. Balancing Test

▉ The defendants further argue that we should uphold the grant of summary judgment on the alternative ground that the balancing analysis set forth in *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731, weighs in their favor. The defendants have the burden of identifying legitimate governmental interests that outweigh the public's interest in Obrist's expressive conduct. *Umbehr*, 518 U.S. at 675–76, 116 S.Ct. 2342; *Ceballos*, 361 F.3d at 1178. The legitimate interest that the defendants advance is the efficient provision of weatherization services to as many low-income people as possible. However, the defendants do not explain how Obrist's expressive conduct decreased the efficiency of the County's weatherization program, and we can conceive of no possible explanation. The County's interest in efficiency would not have been advanced in any way by Obrist's remaining silent on the subject of race or age discrimination.

On the other side of the equation, the public has a strong interest in Obrist's expressive conduct because he sought to assist in the exposure of racial discrimination and other wrongdoing by government officials. *Ceballos*, 361 F.3d at 1178 ("The 'more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.'" (quoting *Johnson*, 48 F.3d at 426)). Whether or not Obrist arranged a quid pro quo agreement with Stephens, there is no suggestion that his testimony or affidavit were untruthful. *Cf. Moran v. Washington*, 147 F.3d 839, 849 (9th Cir.1998). Accordingly, the defendants are not entitled to summary judgment on the ground that the government's legitimate interests outweigh the First Amendment interest in Obrist's expressive conduct.

In sum, we decline to affirm summary judgment with respect to the plaintiffs' § 1983 First Amendment retaliation claim on any of the grounds raised by the defendants, including those that the district court considered and those that it did not.[9]

### III. Supplemental Oregon State Law Claim

▉ The district court granted summary judgment on the plaintiffs' supplemental Oregon law claim for intentional interference with contractual relations on the ground that they did not raise a genuine issue of material fact as to whether Hansen and Swendsen acted solely for their own benefit. *See McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841, 845–49

---

**8.** The defendants also contend that Hansen and Swendsen were not in a position to retaliate against Obrist because they did not have decision-making authority in the development of the new contracts or in the contract bidding process. Here, too, there is a material dispute. Several County personnel and other contractors shared Obrist's view that Hansen and Swendsen exercised de facto control over the weatherization department and used their power to retaliate against Alpha. *See supra* n. 3. Moreover, "a subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have [acted adversely] but for the subordinate's retaliatory conduct." *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir.2002) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854–55 (9th Cir.1999)).

**9.** We remand the issue of County liability under § 1983 for the district court to consider in the first instance.

(1995); *see also Sims v. Software Solutions Unlimited, Inc.,* 148 Or.App. 358, 939 P.2d 654, 657–59 (1997). According to the district court, the plaintiffs established, at most, that Hansen and Swendsen had mixed motives for their actions.

Even if Hansen and Swendsen's actions may have furthered the goals of the weatherization program, it does not necessarily follow that they intended to promote the County's policy objectives when they made their decisions regarding the award of work assignments to Alpha. Rather, a jury could reasonably infer from the evidence offered by the plaintiffs that the two individuals manipulated the County's contracting procedures solely to satisfy their own personal grudges against Alpha and Obrist. *See McGanty,* 901 P.2d at 848; *see also Schram v. Albertson's, Inc.,* 146 Or.App. 415, 934 P.2d 483, 492 (1997).[10] This is a question of motive or intent best left to a jury to resolve. *See Ulrich,* 308 F.3d at 979. Accordingly, we reverse the district court's order granting summary judgment on the plaintiffs' supplemental Oregon state law claim.

## IV. Conclusion

For the foregoing reasons, we **RE-VERSE** the district court's summary judgment order with respect to the plaintiffs' § 1983 First Amendment retaliation claim and their supplemental state law claim of intentional interference with contractual relations and **REMAND** for further proceedings.

**REVERSED AND REMANDED.**

---

**10.** In contrast to their § 1983 claim, the plaintiffs need not prove that retaliation against Obrist's expressive conduct was a substantial or motivating factor for their adverse actions in order to recover for tortious interference with contractual relations under Oregon law. The specific reason for their personal grudge against the plaintiffs is irrelevant so long as they acted solely for their own, and not the County's, benefit.