FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CANDIDO MAREZ,
          *Plaintiff-Appellant,*

v.

STEVEN BASSETT, in his individual
capacity; RONALD DEATON in his
individual capacity; RALPH ESHOM,
in his individual capacity; THOMAS
C. HOKINSON, in his individual
capacity; ARNOLD E. NETKA, in his
individual capacity; COREY
PETERSON, in his individual
capacity; DEPARTMENT OF
WATER AND POWER,
          *Defendants-Appellees.*

No. 08-56035

D.C. No.
2:06-cv-00118-
FMC-RC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
October 6, 2009—Pasadena, California

Filed February 18, 2010

Before: William A. Fletcher and Richard R. Clifton,
Circuit Judges, and Louis H. Pollak,* Senior District Judge.

Opinion by Judge Louis H. Pollak

*The Honorable Louis H. Pollak, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

---

**COUNSEL**

Patricia J. Barry, Los Angeles, California, for the appellant.

Rockard J. Delgadillo, City Attorney; Richard M. Brown, General Counsel, Water and Power; Lisa S. Berger, Deputy City Attorney, Los Angeles, California, for the appellees.

---

**OPINION**

POLLAK, District Judge:

## I.  BACKGROUND

On this appeal, the question addressed is whether, as appellant Candido Marez contends, the district court's grant of summary judgment in favor of defendants was in error. Candido Marez ("Marez" or "plaintiff") was the owner of Montrose Supply, a vendor of a wide variety of products to the Department of Water and Power of the City of Los Angeles ("DWP"), from the late 1980s until 2007, when he sold the business. In 2006, plaintiff, proceeding under 42 U.S.C. § 1983, sued DWP in the Central District of California, alleging that the agency had violated the First Amendment by engaging in adverse action against him because of his public criticism of DWP's procurement procedures.

### A.   The Procurement Process

In order to procure the broad range of goods it needs, DWP relies on small and large vendors. Prior to 2004, DWP awarded contracts through two distinct processes. The first process used "Subpurchase Orders" ("SPOs"), which permitted suppliers to sell small quantities of products directly to DWP purchasing personnel known as "storekeepers." Individual storekeepers awarded these small contracts at their discretion, thereby obviating any need for suppliers to engage in a competitive bidding process. However, SPOs were available only for purchase orders of less than $1000. The second DWP process used competitive bidding. Under this system, DWP publicized to suppliers an offer-request soliciting bids for a stated quantity of a needed product. The lowest bidder received the contract to supply that product. In 2004, DWP implemented extensive changes in the procurement process to eliminate the use of SPOs, which DWP believed were being manipulated by vendors trying to avoid the competitive bidding process.[1]

In the winter of 2004 the Los Angeles City Council established a Small and Local Business Advisory Committee. Plaintiff was appointed to the Committee. The Committee's provenance is described in a February 4, 2004 letter from Mario Marin, Director of the Mayor's Office of Small Business Services, to the plaintiff:

> Congratulations on your recent appointment to the Small and Local Business Advisory Committee

---

[1] In August 2003, DWP began an internal investigation into the alleged illegal practices of Luciano Yi, a DWP storekeeper at DWP Store No. 2. DWP investigated allegations that Yi was "splitting SPOs," meaning that he was using multiple SPOs to make numerous small purchases. In doing so, Yi was said to have bypassed the requirement that contracts for orders worth more than $1000 be awarded through the competitive bidding process. DWP claims it reformed the bidding process as a result of this investigation.

(SLBAC), which was created by a legislative act sponsored by Councilmember Eric Garcetti, Chair of the Housing, Community and Economic Development Committee, and Councilmember Wendy Gruel, Chair of the Audits and Governmental Efficiency Committee. . . .

Over the last year, the City has worked diligently to extend opportunities to businesses in the City of Los Angeles. Initiated in a report by Mayor Hahn, City Attorney Delgadillo and Controller Chick, recommendations were proposed to create a procurement system that was efficient to City departments, cost-effective to the taxpayer, and opportunistic to the small business owner. At a recent public hearing attended by over 300 business owners, community members suggested that a standing committee be established to address small business concerns. As a result of that hearing, a motion was introduced creating the SLBAC. . . .

We look forward to working with you to make the City of Los Angeles the most business friendly city in the country.

The Committee formed a Mega-Contracts Subcommittee of which plaintiff was selected to be one of the two co-chairs. Once he became co-chair, plaintiff began receiving a number of complaints from small business owners about a DWP contract for janitorial services awarded to Empire Janitorial Cleaning Supplies ("Empire"). The chief complaints were that Empire was (1) providing inferior and dangerous items, including broken bottles, and products that lacked safety information and had hand-placed labels, (2) charging prices that were too high, and (3) shrinking the bidding opportunities of small business owners. Plaintiff investigated these allegations and presented his findings to the City Council in March 2004.

Plaintiff claims that, once he began to speak out against Empire and publicly voice other complaints about DWP procurement processes, DWP engaged in adverse action against him. Plaintiff's allegations of adverse action—described more fully below—can be divided into three categories: (1) DWP employees verbally harassed and threatened plaintiff; (2) DWP employees failed to inform plaintiff about opportunities to submit bids and deliberately provided false information regarding contract specifications; and (3) DWP's alleged reforms of the contract process were intended to—and did— negatively affect plaintiff. According to plaintiff, the result was a dramatic decrease in the profits he made from SPO contracts. Plaintiff has further alleged—without providing medical evidence—that his health deteriorated as a result of these actions.

## B. Plaintiff's Conduct and Defendants' Alleged Adverse Actions[2]

Plaintiff first complained about the Empire contract in early 2004. On March 24, 2004, he met with DWP manager Arnie Netka and a staff member from Councilperson Tony Cardenas's office to discuss the Empire contract. On April 20, 2004, plaintiff again met with Netka regarding Empire. That same day, plaintiff received an anonymous threatening phone call from Ralph Eshom, a DWP employee whose voice he recognized. On April 21, 2004, plaintiff and a number of other small business owners appeared before the City Council to complain about the Empire contract.

On April 27, 2004, DWP issued a memo limiting the ability of vendors to interact directly and informally with the warehouse storekeepers. Instead, vendors would be required to make appointments with the senior storekeeper. In June 2004,

---

[2]In the narrative that follows, we accept as true numerous factual assertions for which, at this summary judgment stage, plaintiff has presented some evidence.

DWP informed vendors that SPOs could not be used to "split" orders to avoid competitive bidding.[3]

On May 6, 2004—just fifteen days after appearing before the City Council—plaintiff received two threatening phone calls. At 11:33 a.m, a voice message was left on plaintiff's answering machine telling Marez "you're f----d, you're really f----d." At 11:41 a.m. plaintiff received a message telling him "Candy, leave it alone. Enough is enough. You're going to lose business." There is evidence that the phone call was made from Ralph Eshom's phone line at DWP. The next day plaintiff appeared before the City Council to complain about the threatened retaliation. In June 2004, he met with DWP employees, including defendant Netka, complaining about the difficulties he was having obtaining contracts. On July 7 plaintiff again appeared before the City Council claiming that DWP had retaliated against him for speaking out against the Empire contract.

On June 17, 2004, DWP issued a bid for a tent called the E-Z Up 9000. Mary Beth Wilson, the DWP employee who managed the contract award process, testified that vendors were confused about what type of tent would satisfy the DWP specifications; over half of the bidders stated that the E-Z Up 9000 no longer existed and submitted offers containing alternative models. At the end of the bidding period, plaintiff's business, Montrose Supply, had submitted the lowest price, $106 per tent. DWP decided to reissue the offer-request, explaining that confusion among vendors had distorted the bidding process. However, in his deposition, plaintiff testified that DWP had previously knowingly issued offer-requests that contained confusing or erroneous information without cancelling the bid, and that, on various occasions when DWP had specifically requested the E-Z Up 9000 tent, it had accepted, from plaintiff and other suppliers, bids for alternative models. In this instance, following the reissuance of the offer-request,

---

[3]*See supra* note 1.

plaintiff claims that he again offered the lowest price but that the contract was awarded to CalOlympic Safety.

In August 2004, plaintiff filed a formal grievance with DWP alleging that the tents provided by CalOlympic Safety did not comply with the specified fire safety standards. He also reported this information to the City Council, which then investigated the matter. On October 26, 2004, the City Council Energy & Commerce Committee questioned Netka about the tent bid, and he assured the Councilmembers that the tents delivered met the required fire safety standard. Plaintiff and a City Council legislative analyst subsequently inspected the tags of the tents and found that they were certified under a different fire safety standard. On November 9, 2004, the City Council held another meeting during which Council members confronted DWP about the tents. That same month, following the City Council's investigation, DWP rescinded the contract awarded to CalOlympic Safety and awarded it to plaintiff instead.

Plaintiff also charges that DWP employees deliberately withheld information regarding bid opportunities and in some instances provided him with false information to prevent him from winning contracts. In early 2005, plaintiff emailed DWP employee Montenegro, first on February 18, complaining that he was not being given information for available bids, and then, on March 24, complaining that he was losing business.

In June 2005, Corey Peterson, a DWP employee, asked plaintiff if they had "broken him" yet. When plaintiff asked Peterson what he meant, Peterson stated that plaintiff was not being awarded bids because—once shipping costs were factored in—he was no longer the lowest bidder. Plaintiff subsequently learned that other vendors were allowed to factor in their shipping costs before submitting their bids.

On July 12 plaintiff appeared before the City Council to complain, as he had before, about retaliatory actions directed

at him. On October 19 plaintiff once again informed the City Council about DWP retaliation.

On January 10, 2006, plaintiff met with Montenegro and asked for reassurance that he would be listed as a vendor for certain items. On that day, DWP awarded a contract for silicone compound grease to Globe Pacific at a price of $6.92 per unit—a contract about which plaintiff had specifically asked to be informed when it was available. Plaintiff alleges that, had he been aware of the contract, he would have bid $3.62 per unit and included a prompt-pay discount (the same price he had been charging for this product for the previous eight years).

In February 2006, DWP issued an offer-request for drill parts for which it told plaintiff only American brands would be accepted. As a result, plaintiff did not bid on the contract, but ultimately the contract awarded was for imported drill bits. In March DWP failed to inform plaintiff about a new offer-request for tarps. Having learned of the offer-request from other sources, plaintiff submitted a bid, but it was rejected because plaintiff's brand of tarps was not listed. Yet plaintiff claims that he had been selling this same tarp to DWP for the previous five years—even as recently as August 15, 2005.

Finally, plaintiff offers a more general claim that DWP's reform of the procurement process targeted him and caused him to suffer a major decrease in revenue. Plaintiff claims that after he publicized his complaints regarding the Empire contract in the spring of 2004, his revenues declined significantly. Plaintiff's revenues were as follows: $284,668 in 2001, $394,298 in 2002, $512,870 in 2003, $332,784 in 2004, $383,013 in 2005, and $386,275 in 2006.

The data provided by plaintiff show that from 2003 to 2004 his revenues decreased by $180,086 (more than 30%). In 2005, his revenue increased by $50,229. The following year

his revenue also increased, this time by $3,262. DWP counters that their reforms led to an overall decrease in SPOs, affecting all vendors equally.

## C. Proceedings in the District Court

Plaintiff filed this action on January 6, 2006, and filed a second amended complaint on June 30, 2006. The City responded on September 8, 2006, with two affirmative defenses: first, that plaintiff's speech was not a motivating factor in accepting or rejecting his bids, and, second, that its actions were justified by a legitimate interest in maintaining efficient public services. On February 26, 2008, plaintiff filed a "Motion to Strike Affirmative Defense to Free Speech Retaliation; Or, Alternatively, For Adverse Inference Jury Instruction" on the basis that defendants had destroyed, or withheld, relevant evidence. This motion was denied on March 19, 2008.

Defendants moved for summary judgment on March 17, 2008, and plaintiff responded on March 31. On April 11, the district court granted summary judgment for the defendants, concluding that plaintiff had offered "no evidence" that he had suffered any adverse action. On April 21 plaintiff moved for reconsideration of the summary judgment order; the court denied the reconsideration motion on June 10. Plaintiff now appeals the court's grant of summary judgment, its subsequent denial of his motion to reconsider, and its rejection of the motion to strike defendants' affirmative defenses or to include in the court's jury charge an adverse inference instruction.

## II. Analysis

**[1]** Defendants contend that plaintiff is barred by *Garcetti v. Ceballos*, 547 U.S. 410 (2006), from claiming a violation of the First Amendment. *Garcetti* provides that if a government employee speaks out publicly in a statement made "pur-

suant to [his] official duties," "the Constitution does not insulate [his] communications from employer discipline." *Id.* at 421. Defendants argue that when Marez "took the concerns of vendors and employees to the City Council, he did so pursuant to his official duties, not as a private citizen for First Amendment purposes." In defendants' view, Marez's statements about Empire were "part and parcel of his responsibilities as co-chair" of the subcommittee—responsibilities akin to those of a government employee—and thus, like Ceballos, he was precluded from asserting a constitutional violation.

**[2]** In *Alpha Energy Savers, Inc. v. Hansen*, we explained that, in addressing a section 1983 retaliation claim, "a business vendor operat[ing] under a contract with a public agency" is to be treated with "the same basic approach" as if "the claim had been raised by an employee of the agency." 381 F.3d 917, 923 (9th Cir. 2004) (citing *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 684-85 (1996)). This means requiring "the contractor [to] establish" three elements: "(1) [he] engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against [him]; and (3) [his] expressive conduct was a substantial or motivating factor for the adverse action." *Alpha Energy*, 381 F.3d at 923. We examine each of these factors in turn.

**[3]** There can be no serious dispute that plaintiff engaged in conduct that addressed a matter of public concern.[4] Speech relates to matters of public concern when it addresses "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). In his appearances before the City Council, plaintiff made public allegations, which, inter alia, criticized administration of the

---

[4]Defendants do not question that the substance of plaintiff's comments addressed matters of public concern. Instead, they argue that when Marez "took the concerns of vendors and employees to City Council, he did so pursuant to his official duties."

Empire contract and questioned the safety of Empire products. Claims of government corruption, maladministration, or misuse of funds fall squarely within the First Amendment. *Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009) ("[M]isuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern."); *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) ("[A]n employee's charge of high level corruption in a government agency has all of the hallmarks that we normally associate with constitutionally protected speech.").

**[4]** Defendants contend that, under *Garcetti*, Marez cannot assert a First Amendment claim because he spoke in an official capacity on matters within the scope of his duties as a member of the Small and Local Business Advisory Committee. But *Garcetti*'s denial of First Amendment protection to speech in the course of official duties applies only if Marez's position on the Committee made him a City employee. While *Alpha Energy* affords Marez in his capacity as a private contractor with the City protection from speech-related retaliation similar to the protection enjoyed by government employees, it does not automatically render him a City employee in his unrelated role on the Committee. And, if Marez's Committee position was not itself tantamount to City employment, then *Garcetti* does not sweep statements he made in that capacity outside the protection of the First Amendment.

**[5]** We conclude that the City did not "employ" Marez in his role as a Small and Local Business Advisory Committee member. Marez's Committee position did not entail the usual hallmarks of employment. There is no indication in the record that the City paid Marez or that he wielded any official power. A letter from the Mayor's Office of Small Business Services sent to Marez upon his appointment looked forward "to working with you to make the City of Los Angeles the most business friendly city in the country." Marez was not to work *for* those who governed Los Angeles; he was to work *with* them.

**[6]** A central task of Marez's Committee position, as defendants readily admit, was to voice concerns raised by private citizens *against* City practices. This is the opposite of the role of a traditional employee—an agent who acts, and often speaks, on his employer's behalf. Recognition of employers' "heightened interests in *controlling* speech made by an employee in his or her professional capacity" motivated the *Garcetti* Court to place official-duty speech beyond the First Amendment's reach. *Garcetti*, 547 U.S. at 422-23 (emphasis added). The City here had little similar interest in controlling Marez's speech, because Marez's function on the Committee was largely that of an independent, external representative who "provid[ed] vendors and employees a forum to air their concerns" to the City Council. Defendants' Brief at 34. Marez's relationship with the City was critically different from the employment relationship in *Garcetti*. His status in relation to the government of Los Angeles remained that of an outsider—interested and concerned, to be sure, but an outsider nonetheless. A private citizen. As a result, the rationale that justified speech regulation in *Garcetti* does not fit the facts of this case.

**[7]** The second prong of a section 1983 claim requires plaintiff to show that he was the object of adverse action. As noted above, the district court granted summary judgment for defendants on the grounds that plaintiff had shown "no evidence" of adverse action. We review *de novo* the district court's grant of summary judgment, *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008), and consider the evidence in the light most favorable to plaintiff, the non-moving party, *Thomas v. City of Beaverton*, 379 F.3d 802, 807 (9th Cir. 2004). Plaintiff's allegations raise a number of genuine issues of material fact as to whether he was adversely affected by DWP's actions. Specifically, plaintiff provided evidence that (1) plaintiff's public criticisms of DWP's procurement processes led to (a) threats of reprisals and (b) a precipitous decline in Montrose's revenues; (2) DWP provided erroneous information on a number of bids to deprive him of

contracts; and (3) DWP failed to inform plaintiff about opportunities to submit bids. While the scope, severity and consequences of DWP's actions are belittled by defendants, we have cautioned that "a government act of retaliation need not be severe . . . [nor] be of a certain kind" to qualify as an adverse action. *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). Thus, we conclude that plaintiff's evidence of adverse action raises questions of material fact that cannot be resolved on summary judgment.

**[8]** Finally, we turn to the third factor, whether plaintiff's "expressive conduct was a substantial or motivating factor for the adverse action." *Alpha Energy*, 381 F.3d at 923. Evidence of threatening phone calls and statements provide support for plaintiff's allegations that the changes in the procurement process and plaintiff's drop in revenue, were, at least in some measure, retaliation for plaintiff's "expressive conduct." Evidence showing that DWP's reforms were not applied uniformly to all vendors supports this claim. While DWP counters that the changes in the bidding process were part of the overall reform effort, this is, like the question whether plaintiff was the target of adverse action, an issue of material fact that cannot be resolved on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

### III.   Conclusion[5]

In summary, we vacate the district court's grant of summary judgment to defendants. This case is remanded for further proceedings consistent with this opinion.

VACATED and REMANDED.

---

[5]In addition, we affirm the district court's denial of plaintiff's motion to strike an affirmative defense, or, alternatively, issue an adverse jury instruction. The court's decision to deny sanctions for the loss or destruction of evidence is reviewed for abuse of discretion. *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir. 1985). The district court acted within its discretion when it denied plaintiff's motion on the grounds that, (1) defendants provided plaintiff with all the documents he had requested, and (2) plaintiff had provided no evidence that additional documents existed or were destroyed.

Plaintiff has also appealed the district court's denial of his motion for reconsideration of the grant of summary judgment. Since we have determined that the grant of summary judgment was erroneous, the challenge to the denial of plaintiff's motion for reconsideration is moot.